## SUN PRINTING AND PUBLISHING ASSOCIATION
### *v.* MOORE.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 49.   Argued October 24, 1901.—Decided January 13, 1902.

The trustees of The Sun Association are to be charged with knowledge of the extent of the power usually exerted by its managing editor, and must be held to have acquiesced in the possession by him of such authority, even though they had not expressly delegated it to him, and he is held to have been vested with such power.

An authority to charter a yacht for the purpose of collecting news was clearly within the corporate powers of the association.

It is impossible to assume in this case that the relation of The Sun Association to the hiring of the yacht was simply that of a security for Lord as a hirer of the yacht on his personal account, and the two papers in evidence are in legal effect but one contract, and must be interpreted together.

As the trustees of The Sun Association must be presumed to have exercised a supervision over the business of the corporation, they are to be charged

with knowledge of the extent of the power usually exercised by its managing editor.

The fixing of the value of the vessel in the contract can have but one meaning that the value agreed on was to be paid in case of default in returning.

The decision of the court below that the sum due in consequence of a default in the return of the ship was not to be diminished by the amount of the hire which had been paid at the inception of the contract, was correct.

The naming of a stipulated sum to be paid for the non-performance of a covenant, is conclusive upon the parties in the absence of fraud or mutual mistake.

Parties may, in a case where the damages are of an uncertain nature, estimate and agree upon the measure of damages which may be sustained from the breach of an agreement.

The law does not limit an owner of property from affixing his own estimate of its value upon a sale thereof.

As the stipulation for value in this case was binding upon the parties, the court rightly refused to consider evidence tending to show that the admitted value was excessive.

THE yacht Kanapaha, the property of the respondent Moore, was let on April 1, 1898, for the term of two months, by a charter party, in which Chester S. Lord was recited to be the hirer, but which was signed by him as follows: "Chester S. Lord, for The Sun Printing and Publishing Association." At the time Mr. Lord was, and for many years prior thereto had been, the managing editor of The Sun newspaper, and had special charge of the collection of news for The Sun Printing and Publishing Association, the publisher of the newspaper aforesaid. We shall hereafter speak of this corporation as The Sun Association and of the newspaper as The Sun.

In the body of the charter party the hirer agreed to furnish security, and cotemporaneously with the execution of the contract a paper was signed, which is described in the body thereof as the "understanding or agreement of suretyship" required by the charter party. This paper recited on its face that it was made by "The Sun Printing and Publishing Association," and it also was signed by Lord exactly as he had signed the charter party. Before the time fixed in the charter party had expired, that is to say, about the middle of May, 1898, a second charter party and a second agreement of suretyship were executed.

These agreements were substantially identical with the previous ones, except that they provided for a new term to begin at the expiration of the previous one and to continue for four months thereafter, that is, up to October 1, 1898.

On the execution of the first papers the yacht was delivered to The Sun Association, was by it immediately manned, equipped and provisioned, and one or more of its reporters were placed on board with authority to direct the movements of the vessel, and she was sent to Cuban waters, to be used as a dispatch boat for the purpose of gathering news concerning the events connected with the hostilities between the United States and Spain.

Early in September, 1898, the yacht was wrecked and became a total loss. For a breach of an alleged covenant, to return the vessel, asserted to be contained in the charter party, this libel *in personam* was filed against The Sun Association and the damages were averred to be the value of the vessel, which it was alleged was fixed by the charter party at the sum of $75,000. The District Court held that the writings were contracts of The Sun Association through Lord, its authorized agent, and were virtually one agreement; that by them that corporation was responsible for the non-return of the ship, whether or not the vessel had been lost by the fault of its agents or employés, and that there was a liability to pay the value of the vessel as fixed by the charter. Construing the two writings as a whole, this value, it was held, was subject to be diminished by the extent of the charter hire, paid when the charter party was executed. A judgment was entered for the sum of $65,000, with interest and costs. 95 Fed. Rep. 485. On appeal the Circuit Court of Appeals coincided with the District Court, except it disapproved the conclusion that the value of the vessel should be reduced by the sum of the charter hire. The decree of the District Court was reversed, and the cause remanded with instructions to enter a decree for $75,000, with interest and costs. 101 Fed. Rep. 591. The case was then brought here by certiorari.

*Mr. James Russell Soley* and *Mr. Franklin Bartlett* for The Sun Printing and Publishing Association.

Opinion of the Court.

*Mr. George Zabriskie* for Moore.   *Mr. J. Archibald Murray* was on his brief.

MR. JUSTICE WHITE, after making the foregoing statement, delivered the opinion of the court.

All the issues involved are to be determined by ascertaining the nature of the writings, the obligations which arose from their execution, and the conduct of the parties in connection therewith.   It is essential, then, to bear in mind the exact form of the writings and their text.   They are annexed in the margin.[1]

---

[1] Memorandum of agreement made and entered into this 14th day of May, 1898, by and between William L. Moore of the city of New York, by Thomas Manning, his agent, party of the first part, hereinafter called the owner, and Chester S. Lord of the city of New York, party of the second part, hereinafter called the hirer, witnesseth:

That the said William L. Moore, being the owner of the steam yacht Kanapaha, enrolled in the Atlantic Yacht Club, agrees to let and hereby does let, and the hirer agrees to hire and hereby does hire the said yacht as she is now for the term of four months from the first day of June, expiring on the first day of October now next ensuing, for the sum of ten thousand dollars ($10,000.00), payable on the signing of this agreement.

That the hirer will carry out the provisions of the charter party made on the first day of April last, and will until the expiration of this contract keep said yacht in repair and will pay all its running expenses, including, amongst other things, uniforms, wages, provisions, pilotage, tonnage, light-house and port dues, and any and all other dues and charges, and will surrender said yacht with all its gear, furniture and tackle, at the expiration of this contract, to the owner or his agent, at Manning's basin, foot 26th street, South Brooklyn, New York, in as good condition as at the start, fair wear and tear from reasonable and proper use only excepted, and free and clear of any and all indebtedness, liens or charges of any kind or of any description.

That the hirer will use the said steam yacht as a yacht only, and will under no circumstances use her to carry freight, merchandise or passengers for hire, nor do anything in contravention of its status as a yacht, nor in the sailing or navigating of the same do anything in contravention of the laws of the United States or of any foreign country.

That for the purpose of this charter the value of the yacht shall be considered and taken at the sum of seventy-five thousand dollars ($75,000.00), and the said hirer shall procure security or guarantee to and for the owner in the sum of seventy-five thousand dollars ($75,000.00), to secure any and all losses and damages which may occur to said boat or its belongings,

It would seem to be necessary on the threshold to ascertain whether there was both a principal contract and an accessory contract of suretyship. The two writings are both signed by

---

which may be sustained by the owner by reason of such loss or damage and by reason of the breach of any of the terms or conditions of this contract.

That in the event of the failure of the hirer to return and surrender the said yacht to the owner as hereinbefore provided, the hirer shall be charged demurrage and shall pay demurrage to the owner at the rate of five hundred dollars ($500.00) per day for each and every day's detention.

The hirer shall be liable and responsible for any and all loss and damage to hull, machinery, equipment, tackle, spars, furniture or the like.

That the hirer during the continuance of this agreement shall at all times and at his own cost and expense, keep the said yacht, its hull, machinery, tackle, spars, furniture, gear, boats and the like, in repair.

In witness whereof the parties hereto have hereunto set their hands and seals the day and year first above written.

THOMAS MANNING,
CHESTER S. LORD,
*For The Sun Printing and Publishing Association.*

Whereas by agreement or charter party dated May 14th, 1898, William L. Moore, of. the city of New York, hereinafter called the owner, did or is about to hire or charter unto Chester S. Lord, of the city of New York, hereinafter called the hirer, the steam yacht Kanapaha, enrolled in the Atlantic Yacht Club, as will more fully and at large appear by a copy of said agreement or charter party hereunto annexed and hereby made part hereof.

Now at the request of the said hirer and for valuable consideration received from him, and in consideration of one dollar ($1.00) from the said owner received, and receipt whereof is hereby acknowledged:

We, The Sun Printing and Publishing Company, of the city of New York, for ourselves and each of us, our successor or successors, and for each of our executors or administrators, enter into the following understanding and agreement of suretyship:

*First.* That the said hirer will well and faithfully perform and fulfill everything in and by the said annexed agreement on his part to be kept and performed.

*Second.* That we expressly waive and dispense with notice of any demand, suit or action at law against the hirer, and expressly waive any and all notice of non-performance of the terms of said annexed agreement on the part of the hirer to be kept and performed. The intention of this understanding being to hold us primarily liable under the terms of the annexed agreement.

*Third.* That our liability hereunto shall in no case exceed the sum of seventy-five thousand dollars ($75,000.00.)

Lord in exactly the same character. Judging, by the signatures alone, it is impossible to conceive of two contracts, the one principal and the other accessory thereto, as, in the nature of things, if the first evidenced the obligations of the one who hired and the second manifested the agreement of the same person to fulfill his own duty resulting from the hiring, there could be no accessory contract of suretyship, since both documents but expressed the covenants of the same person relating to one and the same transaction. There is, however, this difference between the two papers. In the body of the first, " Chester S. Lord " is recited to be the hirer, whilst in the body of the second paper it is recited that it is made by The Sun Printing and Publishing Association.

The first question to be determined is, assuming for the present that Lord had authority to bind The Sun Association, Was the first document the individual contract of Lord or that of The Sun Association ?

The rule of law to be applied in the determination of this question is thus expressed in *Whitney* v. *Wyman*, (1880) 101 U. S. 392, 395 :

" Where the question of agency in making a contract arises, there is a broad line of distinction between instruments under seal and stipulations in writing not under seal, or by parol. In the former case the contract must be in the name of the principal, must be under seal, and must purport to be his deed and not the deed of the agent covenanting for him. *Stanton* v. *Camp*, 4 Barb. (N. Y.) 274.

---

In witness whereof we have hereunto set our hands this 14th day of May, 1898.

CHESTER S. LORD,
*For Sun Printing and Publishing Association.*

State of New York,  } ss :
    County of New York,  }

On this 14th day of May, 1898, before me personally appeared Chester S. Lord, to me known and known to me to be the managing editor of The Sun Printing and Publishing Company, and who duly acknowledged that he executed the above undertaking for and on behalf of his firm, under authority of said company, as its act and deed.

A. H. BRADLEY,
*Notary Public, New York.*

[SEAL]

"In the latter cases the question is always one of intent; and the court, being untrammeled by any other consideration, is bound to give it effect. As the meaning of the lawmaker is the law, so the meaning of the contracting parties is the agreement. Words are merely the symbols they employ to manifest their purpose that it may be carried into execution. If the contract be unsealed and the meaning clear, it matters not how it is phrased nor how it is signed, whether by the agent for the principal or with the name of the principal by the agent, or otherwise.

"The intent developed is alone material, and when that is ascertained it is conclusive. Where the principal is disclosed and the agent is known to be acting as such, the latter cannot be made personally liable unless he agreed to be so."

Now, while Lord is referred to in the body of the first writing as an individual, he signed the agreement "*for* The Sun Printing and Publishing Association." Clearly this was a disclosure of the principal, and an apt manner of expressing an intent to bind such principal. *Bradstreet v. Baker,* 14 Rhode Island, 546, 549; *Tucker Manufacturing Company v. Fairbanks,* 98 Mass. 101.

It results that the first paper or charter party manifested the intent to bind The Sun Association as hirer, if Lord possessed the authority which he assumed to exercise, and consequently that the two papers are in legal effect but one contract, must be interpreted together, and the obligations of the parties arising from them be enforced according to their plain import, seeking always to give effect to the intention of the parties.

It is not denied that Lord was in some respects the agent of the corporation; but it is asserted that he had not the power or authority to make a contract of the character here involved. The charter of The Sun Association provided for no other officers to manage its concerns but a board of trustees. In the by-laws provision was made for the election of a president and secretary, whose duties were not prescribed, except as to the signing of certificates of stock and the transferring of stock on the books of the company. An examining committee as also an executive committee were provided for in article VII

of the by-laws, as amended June 27, 1893, a copy of which is excerpted in the margin.[1] The provisions relating to such committees, however, were omitted in the by-laws as amended June 28, 1898.

At the time of the hiring of the Kanapaha, Mr. Paul Dana was the president of The Sun Association, he having been elected to that office on October 26, 1897. Long prior to the last-mentioned date, however, from about 1879, Lord had been the managing editor of The Sun. As such, the evidence establishes, he exercised an unlimited discretionary authority in the collection of news for The Sun, making all pecuniary and other arrangements in respect thereto. Prior to the hiring of the Kanapaha he had, solely on his own volition, hired vessels for the use of The Sun for periods of a week at a time. By whom he was vested with this authority does not appear with certainty, but in the absence of direct evidence we are authorized to presume that the authority was conferred, either directly or indirectly, by the trustees of the association in whom was lodged the power to manage the concerns of the company. *United States* v. *Dandridge,* 1827, 12 Wheat. 64. In the *Dandridge* case, speaking through Mr. Justice Story, the court said (p. 69):

" By the general rules of evidence, presumptions are continually made in cases of private persons of acts even of the most solemn nature, when those acts are the natural result or necessary accompaniment of other circumstances."

After illustrating the application of the principle to cases of public duty and many others, it was said (p. 70):

---

[1] The executive committee shall have the supervision of all the property of the association contained in their building, and of the building itself. It shall be their duty to rent such portion of the same as is not required for the use of the association, and to see that all necessary alterations and repairs are faithfully and economically executed; but no expenditure shall be made by the committee exceeding the sum of five hundred dollars unless by authority of the trustees. They shall report their doings to the trustees at each regular meeting.

It shall be the duty of the examining committee to examine the accounts of the association, and to inquire into both the receipts and disbursements of money. They shall report to the trustees at each regular meeting.

" The same presumptions are, we think, applicable to corporations. .Persons acting publicly as officers of the corporation are to be presumed rightfully in office; acts done by the corporation, which presuppose the existence of other acts to make them legally operative, are presumptive proofs of the latter. Grants and proceedings beneficial to the corporation are presumed to be accepted; and slight acts on their part, which can be reasonably accounted for only upon the supposition of such acceptance, are admitted as presumptions of the fact. If officers of the corporation openly exercise a power which presupposes a delegated authority for the purpose, and other corporate acts show that the corporation must have contemplated the legal existence of such authority, the acts of such officers will be deemed rightful, and the delegated authority will be presumed. If a person acts notoriously as cashier of a bank, and is recognized by the directors, or by the corporation, as an existing officer, a regular appointment will be presumed; and his acts, as cashier, will bind the corporation, although no written proof is or can be adduced of his appointment. In short, we think, that the acts of artificial persons afford the same presumptions as the acts of natural persons. Each affords presumptions, from acts done, of what must have preceded them, as matters of right, or matters of duty."

See, also, *Jacksonville &c. Railway Company* v. *Hooper*, (1896) 160 U. S. 514, 519, and cases cited.

As said in *Mining Co.* v. *Anglo-California Bank*, 104 U. S. 19, speaking through Mr. Justice Harlan:

" An agency may be established by proof of the course of business between the parties themselves; by the usages and practice which the company may have permitted to grow up in its business, and by the knowledge which the board, charged with the duty of controlling and conducting the transactions and property of the corporation, had, or must be presumed to have had, of the acts and doings of its subordinates in and about the affairs of the corporation."

As, therefore, the trustees of The Sun Association must be presumed to have exercised a supervision over the business of the corporation, they are to be charged with knowledge of the

extent of the power usually exerted by its managing editor, and must be held to have acquiesced in the possession by him of such authority, even though they had not expressly delegated it to him.

It being then within the scope of the general authority possessed by Lord to hire the yacht, the contention that in its exercise he must be assumed to have been without right to incur an absolute liability for the return of the vessel or become responsible for the value thereof, and to stipulate as to such value, is without merit. As Lord was charged with the full control of the business of collecting news and impliedly vested with power to enter into contracts in respect thereto, he was, in effect, a general officer of the corporation as to such matters, and it is well settled that the president or other general officer of a corporation has power *prima facie* to do any act which the directors or trustees of the corporation could authorize or ratify. *Oakes* v. *Cattaraugus Water Company,* 143 N. Y. 430, 436, and cases cited. The burden was on The Sun Association to establish that Lord did not possess the authority he assumed to exercise in executing the contracts. *Patterson* v. *Robinson,* 116 N. Y. 193, 200, and cases cited. As the trustees of The Sun Association were unrestrained by the charter, and might have authorized Lord to execute the writings in question, and the association failed to rebut the *prima facie* presumption, he must be held to have been vested with such power.

The argument that if it be granted that the writings embodied an absolute obligation to return and a stipulation as to value in the event of non-return, such conditions were so extraordinary that it must be assumed that authority had not been conferred to agree to them, is equally unfounded. The proposition must rest on the assumption that to charter a yacht upon the conditions referred to was *ultra vires* of the corporation, which, as we have seen is not correct. Certainly an authority to charter a yacht for the purpose of collecting news was clearly within the corporate powers of The Sun Association ; the mere signing of a charter party in execution of such a contract was not illegal, nor can it, we think with any plausibility, be said where, in a case like this, the vessel chartered was to be manned, equipped

and operated by the hirer, to be taken far from her home port, in time of threatened or actual war, on a presumably hazardous venture, that the agreement to absolutely return or, in default, to pay a fixed value, was so beyond the means incidental to the exercise of the power to charter as to cause the act to be beyond the corporate power. For, if the corporation could have done these things, the agent having the broad powers possessed by Lord had a similar right.

But the case in this regard does not depend upon legal presumptions arising from the general course of business in other matters, for the following reasons : The evidence clearly justifies the inference that the president and secretary and the other trustees of The Sun Association knew that Lord had exercised the authority to hire the vessel in question ; that the possession of the vessel was pursuant to a contract, and that some obligation had been entered into for its safe return. Mr. Hitchcock was one of the four trustees and the secretary of The Sun Association. It was his duty to affix the seal of the corporation to instruments, directed by the trustees, to be executed in a formal manner. He was requested by Lord to execute the writings in question, but he declined to do so. The reasons actuating him in refusing do not appear ; but, as he testified that he had nothing to do with the collection of news, it may well be that he felt he could not execute formal documents in a matter not within his department. He does not, however, appear to have regarded the signing of such documents by Lord as improper ; for he subsequently, in conjunction with the business manager, who was also a trustee of The Sun Association, signed a check on behalf of the corporation for a $10,000 payment, as recited on the books of the association, for " charter Kanapaha to October 1."

President Dana testified that he was not consulted in regard to the drawing of the papers, and did not in April or May, 1898, know of their execution. He, however, was aware in those months that dispatch boats were being used by The Sun to obtain news in regard to the progress of events in Cuban waters, such information having been acquired from several sources, including Mr. Lord. President Dana testified that Lord had

charge of the getting of information as to the progress of events in Cuban waters and in connection with the war; that he had talked with him about the matter early in April, 1898, and had inquired if his arrangements were satisfactory. He further testified that if the arrangements made were satisfactory to Lord, they were to the witness, and that that was understood in The Sun office and by the other trustees. Lord attempted no concealment of his actions in respect to the hiring of the Kanapaha. The payments for the hire of the boat, the expenses connected with its management, sundry premiums paid out of the moneys of The Sun Association for insurance upon the yacht, in the sum of nearly $60,000, covering the first five months of the use of the vessel — the later policies expiring only a few days before the loss of the ship — were entered in the books of The Sun. Besides, the association received, under arrangements made by its business manager and trustee, Laffan, money from various newspapers for accommodations furnished to their reporters on board the Kanapaha. All these matters must be presumed to have been brought to the notice of the board, whose duty it was to manage the concerns of the association. The deductions fairly to be drawn from them are susceptible only of the construction that full discretion in the premises had been vested in the managing editor. The strongest possible confirmation of this arises from the fact that Lord, who, under oath, acknowledged when executing the alleged agreement of suretyship, that he possessed the authority to do so, and who was at the time of the trial below in the service of the defendant and able to be produced in court, was not called to the witness stand.

The contract then being that of The Sun Association, made by its agent, duly empowered to that end, and inuring to its benefit, we are not concerned with the questions of ratification discussed at bar, and we are thus brought to consider the obligations which the contract imposed. And, before passing from the subject just considered, it is to be observed that the facts to which we have referred, if there be ambiguity in the writings, confirm the conclusion that the two writings embodied but one contract made by the agent of The Sun in its behalf and for its benefit. This is manifest, because the taking charge

of the ship by the employés of the association, the payment of all the expenses of the vessel, the payment of the rent, the charging of the amount thereof in the books of the association, the use of the vessel for the purposes of the association, the receipt of revenues derived from such use, and the other facts previously stated, when considered together, cause it to be impossible in reason to assume that the relation of The Sun Association to the hiring was simply that of a security for Lord as a hirer of the yacht on his personal account.

It is elementary that, generally speaking, the hirer in a simple contract of bailment is not responsible for the failure to return the thing hired, when it has been lost or destroyed without his fault. Such is the universal principle. This rule was tersely stated by Mr Justice Bradley in *Clark* v. *United States*, 95 U. S. 539, where it was said (p. 542):

" A bailee for hire is only responsible for ordinary diligence and liable for ordinary negligence in the care of the property bailed. This is not only the common law, but the general law on the subject. See Jones, Bailm. p. 88; Story, Bailm. secs. 398, 399; Domat, Lois Civiles, lib. 1, tit. 4, sec. 3, pars. 3, 4; 1 Bell, Com. pp. 481, 483, 7th ed."

But it is equally true that where by a contract of bailment the hirer has either expressly or by fair implication assumed the absolute obligation to return, even although the thing hired has been lost or destroyed without his fault, the contract embracing such liability is controlling and must be enforced according to its terms. In *Strum* v. *Boker*, (1893) 150 U. S. 312, both the elementary principles above stated were clearly expressed by the court, through Mr. Justice Jackson. It was said (p. 330):

" The complainant's common law responsibility as bailee exempted him from liability for loss of the consigned goods arising from inevitable accident. A bailee may, however, enlarge his legal responsibility by contract, *express or fairly implied*, and render himself liable for the loss or destruction of the goods committed to his care—the bailment or compensation to be received therefor being a sufficient consideration for such an undertaking."

This statement of the binding effect of contracts upon those who enter into them was, in substance, but a reiteration of the principle clearly announced in *Dermott* v. *Jones*, (1865) 2 Wall. 1, where it was said:

"It is a well-settled rule of law that if a party by his contract charge himself with an obligation possible to be performed, he must make it good, unless its performance is rendered impossible by the act of God, the law or the other party. Unforeseen difficulties, however great, will not excuse him."

Among the cases approvingly referred to in *Dermott* v. *Jones* were *Bullock* v. *Dommitt*, 6 T. R. 650, and *Brecknock Co.* v. *Pritchard*, Ib. 750, holding that an agreement to keep the property in repair created a binding obligation to rebuild and restore the property, even though its destruction had been caused by inevitable accident.

It is to be observed in passing that the principle sustained by these last mentioned authorities is supported by many adjudications. *Young* v. *Leary*, 135 N. Y. 569, 578; and cases cited.

We approach, then, the contract for the purpose of determining whether by express agreement or by fair implication it put the positive duty on the hirer to surrender the vessel at the expiration of the charter and to be responsible for the value, even although impossibility of return was brought about without his fault. The obligation was expressly imposed upon the hirer to keep "said yacht in repair and to pay all its running expenses, and to surrender said yacht with all its gear, furniture and tackle at the expiration of this contract to the owner or his agent . . . in as good condition as at the start, fair wear and tear from reasonable and proper use only excepted." Not only this, but the charter party contained the further provision that the hirer "shall be liable and responsible for any and all loss and damage to hull, machinery, equipment, tackle, spars, furniture or the like." This provision is immediately followed by a reiteration of the duty to repair, previously stated, by again stipulating "that the hirer during the continuance of this agreement shall at all times and at his own cost and expense keep the said yacht, its hull, machinery, tackle, spars, furniture, gears, boats and the like, in repair."

Pausing for a moment to consider the foregoing stipulations it is difficult to conceive how language could more aptly express the absolute obligation, not only to repair and keep in good order to the end of the hiring and to return, but, moreover, to be responsible for any and all loss and damage to the vessel, her fixtures and appointments. These stipulations seem to us to leave no doubt of the absolute liability to return; in other words, of the putting of the risk of damage or loss of the vessel upon the hirer. But if there could be doubt after considering the provisions just above referred to, such doubt is dispelled when it is considered that the contract proceeds to say that "for the purpose of this charter the value of the yacht shall be considered and taken at the sum of $75,000. And the said hirer shall procure security or guarantee to and for the owner" in the sum stated, "to secure any and all loss and damage which may occur to said boat or its belongings which may be sustained by the owner by reason of such loss or damage and by reason of the breach of any of the terms or conditions of this contract." In other words, having provided for all repairs, having stipulated absolutely for the return of the vessel in full repair, having put the risk of any and all loss on the hirer, the contract then in express terms fixes the value of the vessel, and makes provision for security to protect against any and all loss or damage sustained by a failure of the hirer to fulfill each and all of the positive obligations which the contract imposed.

Concluding, as we do, that by the charter party the absolute obligation to return was placed on the hirer, and that by that contract the risk was hence cast upon him of loss, even be it without his fault, we are led to determine the amount which the owner of the yacht is entitled to recover.

Before passing to this question, however, we remark that we have not entered into any extended review of the case of *Young* v. *Leary*, 135 N. Y. 569, and the conflict of view asserted in argument to exist between the ruling in that case and that made in *Steele* v. *Buck*, 61 Illinois, 343; *Drake* v. *White*, 117 Massachusetts, 10, and *Harvey* v. *Murray*, 136 Massachusetts, 377. We have not done so, because, as we have seen in

the opinion in *Young* v. *Leary*, the absolute duty to repair and keep in repair was conceded to import an obligation to restore the property, even if the impossibility of doing so was brought about without the fault of the bailee. Whatever differences there may be, if any, in the opinions in the cases referred to, arises, not because they expound a discordant view of the law of bailment, but from different applications made of that law to the contract which was under consideration in the particular case. But not only the legal principles announced in the cases referred to, but also the application made of such principles in each and all of the cases, render it necessary to construe a contract like the one we have before us as meaning that which we find it to mean.

Recurring to the amount of liability, it appears that there are two inquiries involved in deciding it; the first, was the obligation imposed by the first writing to pay the agreed value of the vessel in the event of her non-return, and second, if yes, did any modification thereof arise from the second writing? The answer to the first inquiry is afforded by what we have already said in discussing the nature of the obligations assumed by the hirer. As they were to return the vessel in any event, and in default to make good any and all loss arising from a failure to return, the fixing of the value of the vessel can have but one meaning, that is, that the value agreed on was to be paid in case of default in returning. Unless the agreement as to the value meant this it had no import whatever, and its presence in the contract is inexplicable. That the obligation to return or pay the agreed value was not modified by the second writing we think is clear.

In that writing it is provided that The Sun Association bound itself that the hirer would faithfully fulfill and perform all the obligations expressed in the previous writing. Certainly, because of the contract that all the previous agreements are to be fulfilled, it cannot be that some of them were destroyed. But proceeding to make its significance if possible clearer, the second writing adds that the intention of the parties to it is to hold The Sun Association " primarily liable " for the obligations

created by the prior writing. To stipulate primary liability for prior obligations cannot be so construed as to destroy them.

True, the provisions just referred to are followed by the stipulation that "all our liability hereunto shall, in no case, exceed the sum of $75,000." This cannot mean that the obligations expressly assumed were destroyed, but that in case they were not fulfilled, the damage brought about by each and every breach should not exceed $75,000. The contrary cannot be said without holding that a provision, which was manifestly intended to add sanction to the obligations, in effect abrogated them. And the import of the clause under consideration is demonstrated by the provision in the first writing, by which it was agreed that the second paper should be signed. The provision is, "The said hirer shall procure security or guarantee, in and for The Sun, in the sum of $75,000, to secure any and all loss and damage which may occur to said boat, or its belongings, which may be sustained by the owner, by reason of such loss or damage and by reason of the breach of any of the terms or conditions of the contract."

The second writing unquestionably stipulated a penalty for the performance of each and all the obligations, but, fixing a penalty, in case of a default, did not extinguish them. The meaning of the provision becomes quite clear when all the provisions are taken into view in their proper connection. They all naturally divide themselves into two classes, the one relating to the payment of the hire, the payment of the expenses of the operation of the vessel, the making of repairs, etc.—from which we may eliminate the hire, as it was to be paid on the execution of the contract; and the other to the duty to return, or pay in default, the value agreed on. We say they naturally so divide themselves, because in no reasonable probability could a default in both cases simultaneously exist. Thus, if the vessel was not returned and the owner got the value as fixed in the contract, he could suffer no loss for any default of the hirer in failing to pay for repair, etc., or for a breach of the covenant to pay the running expenses of the vessel, as no personal liability therefor could attach to him. And in the event of a return of the vessel, lessened in value by the failure to repair,

or burdened with charges, because of default in paying running expenses, no loss could come to the owner if he was indemnified up to the extent of $75,000, the value of the vessel, which, it will be seen, was, hence in any probable event, the maximum sum of liability which the parties supposed might result from a breach of the covenants contained in the charter party.

The contract arising from the two writings having this import, the court below correctly decided that the sum due, as a consequence of a default in the return of the ship, was not to be diminished by the amount of the hire which had been paid at the inception of the contract. To have otherwise ruled would have destroyed in part the express agreement that the failure to return should be compensated by the payment of the agreed value. Such would have been its inevitable result, as it would have reduced the sum due for the default in not returning the ship, by crediting the hirer with the amount of the hire he had paid without default on an independent and distinct liability.

The foregoing considerations are adequate to dispose of the case, if it be that the rights of the parties are to be administered according to the contract into which they voluntarily entered. In substance, however, it is pressed with much earnestness and sought to be supported by copious reference to authority that the intent of the contracting parties should not be given effect to, because it is our duty to disregard the contract and substitute our will or our conception of what the parties should have done for that which they did plainly do. This contention thus arises.

Upon the trial, The Sun Association introduced some evidence tending to show that the value of the yacht was a less sum than $75,000, and it claimed that the recovery should be limited to such actual damage as might be shown by the proof. The trial judge, however, refused to hear further evidence offered on this subject, and in deciding the case disregarded it altogether. The rulings in this particular were made the subject of exception and error was assigned in relation thereto in the Circuit Court of Appeals. That court held that the value fixed in the contract was controlling, especially in view of the fact that a yacht had no market value.

The complaint, that error in this regard was committed, is

thus stated in argument : "The naming of a stipulated sum to
be paid for the non-performance of a covenant is not conclusive
upon the parties merely in the absence of fraud or mutual mis-
take; that, *if the amount is disproportioned to the loss*, the court
has the right and the duty to disregard the particular expressions
of the parties and to consider the amount named merely as a
penalty, even though it is specifically said to be liquidated
damages." Now it is to be conceded that the proposition thus
contended for finds some support in expressions contained in
some of the opinions in the cases cited to sustain it. Indeed, the
contention but embodies the conception of the doctrine of penal-
ties and liquidated damages expressed in the reasoning of the
opinions in *Chicago House Wrecking Co.* v. *United States*, (1901)
106 Fed. Rep. 385, 389, and *Gay Manufacturing Co.* v. *Camp*,
(1895) 25 U. S. App. 134, 65 Fed. Rep. 794, 68 Fed. Rep. 67,
viz., that "where actual damages can be assessed from tes-
timony," the court must disregard any stipulation fixing the
amount and require proof of the damage sustained. We think
the asserted doctrine is wrong in principle, was unknown to the
common law, does not prevail in the courts of England at the
present. time, and it is not sanctioned by the decisions of this
court. And we shall, as briefly as we can consistently with
clearness, proceed to so demonstrate.

At common law prior to the statute of 8 & 9 William III, c.
11, in actions "upon a bond, or on any penal sum, for non-per-
formance of any covenants or agreements, contained in any in-
denture, deed, or writing," judgment, when entered for the
plaintiff, was for the amount of the penalty, as of course.
*Watts* v. *Camors*, 115 U. S. 360; Story, Eq. Jur. sec. 1311.
Equity, however, was accustomed to relieve in cases of penal-
ties annexed to bonds and other instruments, the design of which
was to secure the due fulfillment of a principal obligation.
Story, Eq. Jur. sec. 1313. The effect of the passage of the
statute was to restrict suitors in actions for penalties to a col-
lection of the actual damages sustained. As a result, also,
courts of law were thereafter frequently under the necessity of
determining whether or not an agreed sum stipulated in a bond

or other writing to be paid, in the event of a breach of some condition, was in reality a penalty or liquidated damages.

Of course, courts of common law, merely by reason of the statute of 8 & 9 William III, referred to, did not acquire the power to give relief in cases of contract, where a court of equity would not have exercised a similar power. Now courts of equity do not grant relief in cases of liquidated damages—that is, cases " when the parties have agreed that, in case one party shall do a stipulated act, or omit to do it, the other party shall receive a certain sum, as the just, appropriate and conventional amount of the damages sustained by such act or omission." Story, Eq. Jur. sec. 1318. And, as long ago as 1768, Lord Mansfield, in *Lowe* v. *Peers*, 4 Burr. 2225, said—italics in original (p. 2228): " Courts of equity will *relieve against a penalty*, upon a *compensation ;* but where the covenant is to pay a particular *liquidated* sum, a court of equity can *not* make a *new* covenant for a man ; nor is there any *room* for *compensation* or *relief*." Commenting upon the judgment of Lord Eldon in one of the leading cases on the subject of liquidated damages, (*Astley* v. *Weldon*, 2 Bos. & Pul. 346, 350,) Jessel, Master of the Rolls, in *Wallis* v. *Smith*, 21 Ch. D. 243, 256, said (p. 260):

" He perfectly well knew that whatever had been the doctrine of equity at one time, it was not then the doctrine of equity to give relief on the ground that agreements were oppressive where the parties were of full age and at arm's length. It is very likely, and I believe it is true historically, that the doctrine of equity did arise from a general notion that these acts were oppressive. At all events, long before his time, it had been well settled in equity that equity did relieve from forfeiture for non-payment of money, and I think I may say, in modern times, from nothing else."

The doctrine of equity as respects the withholding of or granting relief against a contract because of inadequacy of consideration, illustrates the conservative disposition of equity not to interfere unnecessarily with the contracts of individuals. Equity declines to grant relief because of inadequacy of price, or any other inequality in the bargain; the bargain must be so uncon-

scionable as to warrant the presumption of fraud, imposition or undue influence.   Story, Eq. Jur. secs. 244, 245.

Whilst the courts of the United States, in actions at law, undoubtedly possess the power conferred upon the courts of common law by the statute of 8 & 9 William III, and whilst recognition of such power was embodied in the judiciary act of 1879, reproduced in section 961 of the Revised Statutes, the duty of such courts to give effect to the plainly expressed will of contracting parties is as imperatively necessary now as it was at common law after the adoption of the English statute, as will be made manifest by a reference to some of the adjudications of this court.

The decisions of this court on the doctrine of liquidated damages and penalties lend no support to the contention that parties may not *bona fide*, in a case where the damages are of an uncertain nature, estimate and agree upon the measure of damages which may be sustained from the breach of an agreement. On the contrary, this court has consistently maintained the principle that the intention of the parties is to be arrived at by a proper construction of the agreement made between them, and that whether a particular stipulation to pay a sum of money is to be treated as a penalty, or as an agreed ascertainment of damages, is to be determined by the contract, fairly construed, it being the duty of the court always, where the damages are uncertain and have been liquidated by an agreement, to enforce the contract.   Thus, Chief Justice Marshall, in *Tayloe* v. *Sandiford*, 7 Wheat. 11, although deciding that the particular contract under consideration provided for the payment of a penalty, clearly manifested that this result was reached by an interpretation of the contract itself.   He said (p. 17):

"In general, a sum of money in gross, to be paid for the non-performance of an agreement, is considered as a penalty, the legal operation of which is, to cover the damages which the party, in whose favor the stipulation is made, may have sustained from the breach of contract by the opposite party.   It will not, of course, be considered as liquidated damages; and it will be incumbent on the party who claims them as such to show that they were so considered by the contracting parties.   Much

stronger is the inference in favor of its being a penalty, when it is expressly reserved as one. The parties themselves denominate it a penalty; and it would require very strong evidence to authorize the court to say that their own words do not express their own intention. These writings appear to have been drawn on great deliberation; and no slight conjecture would justify the court in saying that the parties were mistaken in the import of the terms they have employed." `

And, after having thus established that on the face of the contract it stipulated a penalty and not liquidated damages, the opinion proceeded to refute the construction relied on to sustain the contrary view that the contract manifested the intention to assess liquidated damages. In connection therewith the Chief Justice observed (p. 18):

" The plaintiff in error relies on the case of *Fletcher* v. *Dycke,* reported in 2 T. R. 32, in which an agreement was entered into to do certain work within a certain time, and if the work should not be done within the time specified, ' to forfeit and pay the sum of £10 for every week,' until it should be completed.

" But the words ' to forfeit and pay ' are not so strongly indicative of a stipulation in the nature of a penalty, as the word ' penalty ' itself; and, the agreement to pay a specified sum weekly during the failure of the party to perform the work partakes much more of the character of liquidated damages than the reservation of a sum in gross."

In *Van Buren* v. *Digges,* 11 How. 461, also construing a building contract, it was said (p. 477):

" The clause of the contract providing for the forfeiture of ten per centum on the amount of the contract price, upon failure to complete the work by a given day, cannot properly be regarded as an agreement or settlement of liquidated damages. The term ' forfeiture ' imports a penalty; it has no necessary or natural connection with the measure or degree of injury which may result from a breach of contract, or from an imperfect performance. It implies an absolute infliction, regardless of the nature and extent of the causes by which it is superinduced. *Unless, therefore, it shall have been expressly adopted and declared by the parties to be a measure of injury or compensation, it is*

*never taken as such by courts of justice, who leave it to be enforced where this can be done in its real character, viz., that of a penalty.*" [Italics not in original.]

See, also, *Quinn* v. *United States*, 99 U. S. 30; *Clark* v. *Barnard*, 108 U. S. 436, 454; *Watts* v. *Camors*, 115 U. S. 353, 360; *Bignall* v. *Gould*, 119 U. S. 495. The last cited case illustrates the character of disproportion apparent on the face of a contract which has influenced a court when endeavoring to ascertain the meaning of parties to a contract in a stipulation for the payment of a designated sum for the breach of a condition. There the penal sum was $10,000, several breaches of the conditions of the bond might be committed, to each of which the stipulated sum would be applicable, and one such breach might be the failure to obtain a release of a claim of but ten dollars.

The courts in England, as already intimated, consistently maintain the right of individuals, when contracting with each other, to estimate the value of property or otherwise determine the quantum of damages for a breach of an agreement, where the damage is of an uncertain nature. *Irving* v. *Manning*, (1847) 1 H. L. Cas. 287, 307, 308; *Ranger* v. *Great Western Ry. Co.*, (1854) 5 Ib. 72, 94, 104, 118; *Dimech* v. *Corlett*, (1858) 12 Moore's P. C. 199, 229; *Lord Elphinstone* v. *Monkland Iron & Coal Co.*, (1886) App. Cas. 332, 345, 346; *Price* v. *Green*, (1847) 16 M. & W. 346, 354.

We content ourselves with a few brief excerpts from some of the decisions just referred to. In *Ranger* v. *Great Western Railway Co.*, in the course of his opinion Lord Cranworth said (p. 94):

"There is no doubt that where the doing of any particular act is secured by a penalty, a court of equity is, in general, anxious to treat the penalty as being merely a mode of securing the due performance of the act contracted to be done, and not as a sum of money really intended to be paid. On the other hand, it is certainly open to parties who are entering into contracts to stipulate that, on failure to perform what has been agreed to be done, a fixed sum shall be paid by way of compensation."

In *Lord Elphinstone* v. *Monkland Iron & Coal Co.*, (1886)

App. Cas. 332—a Scotch appeal—Lord Fitzgerald, in the course of his opinion, said (p. 436):

"I am not aware that there is any enactment in force in Scotland corresponding to our statute of 8 and 9 Wm. III, c. 11, s. 8; nor does the Scotch law seem to have required such aid. We may take it, then, that by the law of Scotland the parties to any contract may fix the damages to result from a breach at a sum estimated as liquidated damages, or they may enforce the performance of the stipulations of the agreement by a penalty.

"In the first instance, the pursuer is, in case of a breach, entitled to recover the estimated sum as pactional damages, irrespective of the actual loss sustained. In the other, the penalty is to cover all the damages actually sustained, but it does not estimate them, and the amount of loss (not, however, exceeding the penalty) is to be ascertained in the ordinary way. In determining the character of these stipulations we endeavor to ascertain what the parties must reasonably be presumed to have intended, having regard to the subject-matter, and certain rules have been laid down as judicial aids."

In *Irving* v. *Manning*, (1847) 1 H. L. Cas. 287, it was recognized that a policy of assurance was a contract of indemnity, but it was declared that in a valued policy the agreed value was conclusive, and each party must be held to have conclusively admitted that the sum fixed by agreement should be that which the other was entitled to receive in case of a total loss. In that case the opinion of the judges was delivered by Mr. Justice Patterson, and we excerpt from the opinion of that justice in *Price* v. *Green*, (1847) 16 M. & W. 346, on error from the Court of Exchequer, as follows (p. 354):

"The £5000 is expressly declared by the covenant to be 'as and by way of liquidated damages, and not of penalty.' It is a sum named in respect of the breach of this one covenant only, and the intention of the parties is clear and unequivocal. The courts have indeed held that, in some cases, the words 'liquidated damages' are not to be taken according to their obvious meaning; but those cases are all where the doing or omitting to do several things of various degrees of importance is secured by the sum named, and, notwithstanding the language

used, it is plain from the whole instrument that the intention was different."

In *Wallis* v. *Smith*, (1882) 21 Ch. D. 243, the leading cases in England on the subject of penalties and liquidated damages were commented upon by the Court of Appeal. Jessel, Master of the Rolls, classified the decisions and *dicta* on the subject. His summary will be found in the margin,[1] and measuring the contract in this case, by the rules which are embodied in the recapitulation, it follows that the stipulated sum is embraced in the category of liquidated damages.

---

[1] 1. Where a sum of money is stated to be payable either by way of liquidated damages, or by way of penalty for breach of stipulations, all or some of which are, or one of which is, for the payment of a sum of money of less amount, that is really as penalty, and you can only recover the actual damage, and the court will not sever the stipulations.

2. Cases "in which the amount of damages is not ascertainable *per se*, but in which the amount of damages for a breach of one or more of the stipulations either must be small, or will, in all human probability, be small—that is, where it is not absolutely necessary that they should be small; but it is so near to a necessity, having regard to the probabilities of the case, that the court will presume it to be so.

Then the question is whether in that class of cases the same rule applies. Now, upon this there is no decision. There are a great many *dicta* upon the question, and a great many *dicta* on each side. I do not think it is necessary to express a final opinion in this case, but I do say this, that the court is not bound by the *dicta* on either side, and the case is open to discussion. It is within the principle, if principle it be, of a larger sum being a penalty for non-payment of a smaller sum; but, at the same time, it is also within another class of cases to which I am now going to call attention.

3. The class of cases to which I refer is that in which the damages for the breach of each stipulation are unascertainable, or not readily ascertainable, but the stipulations may be of greater or less importance, or they may be of equal importance. There are *dicta* there which seem to say that if they vary much in importance the principle of which I have been speaking applies, but there is no decision. On the contrary, all the reported cases are decisions the other way; although the stipulations have varied in importance the sum has always been treated as liquidated damages.

4. A class of cases relating to deposits. Where a deposit is to be forfeited for the breach of a number of stipulations, some of which may be trifling, some of which may be for the payment of money on a given day, in all those cases the judges have held that this rule does apply and that the bargain of the parties is to be carried out. I think that exhausts the substance of the cases.

In *Strickland* v. *Williams*, (1899) 1 Q. B. 382, Lord Justice A. L. Smith appears to have stated an additional class to those mentioned by Jessel, M. R. He said (p. 384): " In my opinion, it is the law that where payment is conditioned on one event, the payment is in the nature of liquidated damages." This but seems to reiterate the proposition of Justice Patterson in *Price* v. *Green*, previously cited. It was undoubtedly meant that the " event" should not be the mere non-performance of an *ordinary* agreement for the payment of money. See, also, per Bramwell, B., in *Sparrow* v. *Paris*, (1862) 7 Hurl. & N. 594, 599.

Now the stipulation here being considered, obviously would be within the last class, for it was a promise to pay a stipulated sum on the breach of a covenant to return the yacht to its owner.

With the exception of the more recent decisions, the cases generally on liquidated damages and penalties, as well those decided in England as in this country, are reviewed in 2 Evans-Pothier on Obligations, pp. 88 to 111, and in a note to *Graham* v. *Bickham*, 1 American Decisions, 328, 331, *et seq.* A list of some of the later decisions of the state courts is found in the margin.[1]

The character of the stipulation under consideration, renders it unnecessary to review in detail the decisions of the state courts. There is in them much contrariety of opinion on some phases of the doctrine, but our attention has not been called to

---

[1] *Hoagland* v. *Segur*, (1876) 38 N. J. Law, (9 Vroom) 230; *Wolf* v. *Des Moines & Fort Dodge Railway Co.*, (1884) 64 Iowa, 380, 386; *Burrill* v. *Daggett*, (1885) 77 Maine, 545; *Jaqua* v. *Headington*, (1888) 114 Indiana, 309; *Wibaux* v. *Grinnell Live Stock Co.*, (1889) 9 Montana, 154; *Wilhelm* v. *Eaves*, (1891) 21 Oregon, 194; *Hennessy* v. *Metzger*, (1894) 152 Illinois, 505; *Willson* v. *Mayor &c. of Baltimore*, (1896) 83 Md. 203, 210; *May* v. *Crawford*, (1898) 142 Missouri, 390; *Garst* v. *Lockey Piano Case Co.*, (1900) 177 Mass. 91; *Illinois Central R. R. Co.* v. *Southern Seating & Cabinet Co.*, (1900) 104 Tenn. 568; *Weedon* v. *American Bonding & Trust Co.*, (1901, North Carolina,) 38 So. E. 255; *Young* v. *Gaut*, (1901, Arkansas,) 61 S. W. 372; *Knox Rock-Blasting Co.* v. *Grafton Stone Co.*, (1901, Ohio) 60 N. E. Rep. 563; *Johnson* v. *Cook*, (1901, Washington) 64 Pacific Rep. 729; *Taylor* v. *Times Newspaper Co.*, (1901, Minnesota) 86 N. W. Rep. 760; *Emery* v. *Boyle*, (1901, Pennsylvania) 49 Atlantic Reporter, 779.

any case which sustains the contention that a valuation clause, such as that we are considering, contained in a contract made under circumstances like those which existed when this contract was executed, must be disregarded despite the evident intention of the parties to treat the sum named as estimated and ascertained damages for a breach of the covenant to return the yacht. That the courts of the State of New York do not lend any support to such a contention—which it was strenuously argued at bar they do—we will make evident.

The case of *Ward* v. *Hudson River Building Co.*, (1891) 125 N. Y. 230, is not an authority for the contention in question. Equitable relief was sought in that case against the enforcement of a stipulation, which the court, however, held to be liquidated damages and binding on the parties. True the court did say, on page 235, that "where, however, a sum has been stipulated as a payment by the defaulting party, which is disproportioned to the presumable or probable damage, or to readily ascertainable loss, the courts will treat it as a penalty and will relieve, on the principle that the precise sum was not of the essence of the agreement, but was in the nature of a security for performance." There is nothing, however, in this excerpt to countenance the claim that where it is clear from the terms of the contract that the precise sum *was* of the essence of the agreement and *was* the agreed amount of estimated damages, no fraud or imposition having been practiced, either a court of equity or of law might rightfully decline to give effect to the stipulation. Nor does the quoted statement support the further claim that a court of law in an action on a contract to recover a stipulated sum as damages might let in evidence to establish that a mere disproportion existed between the agreed sum and the actual damage, for the purpose of avoiding the stipulation. The meaning of the court is made clear by the following statement, appearing on the same page with the above excerpt: "We may, at most, say that where they have stipulated for a payment in liquidation of damages, which are in their nature uncertain and unascertainable with exactness, and may be dependent upon extrinsic considerations and circumstances, and the amount is not, *on the face of the contract*, out

of all proportion to the probable loss, it will be treated as liquidated damages." An inspection of the opinion in the *Ward* case also shows that the New York court approvingly referred to prior decisions of the courts of that jurisdiction, *Dakin* v. *Williams*, 17 Wend. 447, and 22 Wend. 201, where it was emphatically recognized that parties might embody in their contract an agreed valuation of property or any other quantum of damages, where the damage was uncertain in its nature. We quote, in this connection, from the opinion as reported in 17 Wend. delivered by Chief Justice Nelson, afterwards a member of this court. It was said (p. 454):

" The next question presented upon the above conclusion is whether the sum of $3000 is to be viewed as damages liquidated by the contract of the parties, or only in the light of a *penalty ?* There are many cases in the English books in which this question has been very fully examined and considered, but it would be an unprofitable consumption of time to go over them with a view or expectation of extracting any useful general principle that could be applied to this case. The following are the leading cases: *Astley* v. *Weldon*, 2 Bos. & Pul. 346; *Burton* v. *Glover*, Holt's N. P. R. 43, and note; *Reilley* v. *Jones*, 1 Bing. 302; *Davies* v. *Penton*, 6 Barn. & Cres. 216; *Crisdee* v. *Bolton*, 3 Carr. & Payne, 240; *Randall* v. *Everest*, 2 Id. 577; *Kemble* v. *Farren*, 6 Bing. 141. In our court are the following: *Dennis* v. *Cummins*, 3 Johns. Cas. 297; *Slosson* v. *Beadle*, 7 Johns. R. 72; *Spencer* v. *Tilden*, 5 Cowen, 144, and note, p. 150; *Nobles* v. *Bates*, 7 Id. 307; *Knapp* v. *Maltby*, 13 Wendell, 587. From a critical examination of all these cases and others that might be referred to, it will be found that the business of the court, in construing this clause of the agreement, as in respect to every other part thereof, is to inquire after the meaning and intent of the parties; and when that is clearly ascertained from the terms and language used, it must be carried into effect. A court of law possesses no dispensing powers; it cannot inquire whether the parties have acted wisely or rashly, in respect to any stipulation they may have thought proper to introduce into their agreements. If they are competent to contract within the prudential rules the law has fixed as to parties, and there has been

no fraud, circumvention or illegality in the case, the court is bound to enforce the agreement. Men may enter into improvident contracts where the advantage is knowingly and strikingly against them; they may also expend their property upon idle or worthless objects, or give it away if they please without an equivalent, in spite of the powers or interference of the court; and it is difficult to see why they may not fix for themselves by agreement in advance, a measure of compensation, however extravagant it may be, for a violation of their covenant, (they surely may after it has accrued,) without the intervention of a court or jury. Can it be an exception to their power to bind themselves by lawful contract? We suppose not; and regarding the intent of the parties, it is not to be doubted but that the sum of $3000 was fixed upon by them 'mutually and expressly,' as they say, 'as the measure of damages for the violation of the covenant, or any of its terms or conditions.' If it be said that the measure is a hard one, it may be replied, that the defendants should not have stipulated for it; or having been thus indiscreet, they should have sought the only exemption, which was still within their power, namely, the faithful fulfillment of their agreement."

Chancellor Walworth, in the opinion rendered in the same case by the Court for the Correction of Errors, embodied in his opinion the following (22 Wend. 201, 213):

"In *Hubbard* v. *Grattan and wife*, Alcock & Nap. R. 389, in which an action was brought to recover the stipulated damages which the defendant agreed to pay if he did not remove a lime kiln adjacent to the plaintiff's premises, Bushe, Ch. J., says: 'The stipulation consists of two parts, one affirmative that the lime kiln should be prostrated before a particular day; the other negative that the assignee shall not at any future time erect another lime kiln; and upon those the breaches are assigned. Both bear on one object, to be relieved from the lime kiln altogether, and both are essential to that object being accomplished; and both parties agree in measuring beforehand the damages consequent upon a breach of either agreement. Such stipulations as to damages are upheld by courts of law upon two grounds: 1st. Because a man may set a value, not

only upon matters connected with his property, which value is capable of being ascertained, but upon matters of taste and fancy, such as prospect or ornament, which he alone can appreciate; and, 2dly, because even in matters capable of ascertainment, great difficulties might occur in some cases; and, in all cases, it is prudent in both parties to provide against the trouble and expense of a future investigation; and the cases which seem to have interfered with such compacts, are those in which the subject matter of the stipulation shews that, whatever the form of it may be, the parties could not have contemplated any more than a penalty to secure against actual damage."

So, also, the case of *Bagley* v. *Peddie*, (1857) 16 N. Y. 469, 471, makes clear the fact that the New York courts recognize the right of parties to agree beforehand upon damages to be sustained by the breach of a contract, and that evidence *aliunde* the instrument declared on cannot be received respecting the amount of damage. The last two of what were termed "artificial rules" on the subject of liquidated damages and penalties, recited in the opinion as being peculiar to contracts of this character, were as follows:

".Sixth. If, independently of the stipulated damages, the damages would be wholly uncertain and incapable of being ascertained except by conjecture, in such case the damages will be considered liquidated if they are so denominated in the instrument; Seventh. If the language of the parties evince a clear and undoubted intention to fix the sum mentioned as liquidated damages in case of default of performance of some act agreed to be done, then the court will enforce the contract, if legal in other respects."

Following a review of several decided cases in England, the court said (p. 474):

"The above cases will serve to illustrate the kind of certainty as to the sum to be paid as damages for breach of an agreement in order to hold the larger sum agreed to be paid on such breach a mere penalty. They are cases where the lesser sum is named specifically in the instrument itself, or depends on the award of arbitrators. These and similar cases are the cases of certain damages to which the courts allude in the third rule."

The court then quoted approvingly the prior decision of the Supreme Court in *Dakin* v. *Williams, supra,* and concluded as follows (p. 475):

" The case at bar seems to me to fall within the sixth rule, the damages being wholly uncertain and depending entirely on proof *aliunde* the instrument declared on."

And in connection with the New York cases it becomes pertinent to notice the case of *Gay Manufacturing Co.* v. *Camp,* (1895) 25 U. S. App. 134, on rehearing, 376; 68 Fed. Rep. 67, much relied upon in argument. As we have previously observed, language is employed in that opinion which, broadly interpreted, seems to countenance the idea that if a jury can ascertain the damages suffered by the breach of a stipulation, an agreement by the parties, embodied in a written contract, fixing such damages, will be treated as a nullity. This deduction appears to have been drawn from certain rules of construction respecting liquidated damages and penalties enunciated by the trial judge in *Bagley* v. *Peddie,* 5 Sanford, 192, 194, the judgment in which case, it is proper to remark, was reversed by the appellate court in 16 N. Y. 469, already referred to. We do not think, however, the interpretation we have noticed as having been put upon the rules in question was warranted; at least, as we have shown, such a doctrine is altogether untenable. Nor do the other authorities cited in the opinion in the *Gay* case lend support to the asserted doctrine. Those authorities were *Harris* v. *Miller,* 11 Fed. Rep. 118, 121, and a note to *Spencer* v. *Tilden,* (1825) 5 Cowen, 144, 150. *Harris* v. *Miller* is referred to because of the statement by Judge Deady, that the courts, " instead of giving effect to the contract of the parties according to their intentions, assumes to control them according to their standard of justice." The note to 5 Cowen need not be commented upon, in view of the reference we have made to later decisions of the courts of New York.

It may, we think, fairly be stated that when a claimed disproportion has been asserted in actions at law, it has usually been an excessive disproportion between the stipulated sum and the possible damages resulting from a trivial breach *apparent on the face of the contract,* and the question of disproportion has been

simply an element entering into the consideration of the question of what was the intent of the parties, whether *bona fide* to fix the damages or to stipulate the payment of an arbitrary sum as a penalty, by way of security.

In the case at bar, aside from the agreement of the parties, the damage which might be sustained by a breach of the covenant to surrender the vessel was uncertain, and the unambiguous intent of the parties was to ascertain and fix the amount of such damage. In effect, however, the effort of the petitioner on the trial was to nullify the stipulation in question by mere proof, not that the parties did not intend to fix the value of the yacht for all purposes, but that it was improvident and unwise for its agent to make such an agreement. Substantially, the petitioner claimed a greater right than it would have had if had made application to a court of equity for relief, for it tendered in its answer no issue concerning a disproportion between the agreed and actual value, averred no fraud, surprise or mistake, and stated no facts claimed to warrant a reformation of the agreement. Its alleged right to have eliminated from the agreement the clause in question, for that is precisely the logical result of the contention, was asserted for the first time at the trial by an offer of evidence on the subject of damages.

The law does not limit an owner of property, in his dealings with private individuals, respecting such property, from affixing his own estimate of its value upon a sale thereof, or on being solicited to place the property at hazard by delivering it into the custody of another for employment in a perilous adventure. If the would-be buyer or lessee is of the opinion that the value affixed to the property is exorbitant, he is at liberty to refuse to enter into a contract for its acquisition. But if he does contract and has induced the owner to part with his property on the faith of stipulations as to value, the purchaser or hirer, in the absence of fraud, should not have the aid of a court of equity or of law to reduce the agreed value to a sum which others may deem is the actual value. And, as pertinent to these observations, we quote from the opinion delivered by Wright, J., in *Clement* v. *Cash*, 21 N. Y. 253, where it was said (p. 257):

"When the parties to a contract, in which the damages to be

ascertained, growing out of a breach, are uncertain in amount, mutually agree that a certain sum shall be the damages, in case of a failure to perform; and in language plainly expressive of such agreement, I know of no sound principle or rule applicable to the construction of contracts, that will enable a court of law to say that they intended something else. Where the sum fixed is greatly disproportionate to the presumed actual damages, probably a court of equity may relieve; but a court of law has no right to erroneously construe the intention of the parties, when clearly expressed, in the endeavor to make better contracts for them than they have made for themselves. In these, as in all other cases, the courts are bound to ascertain and carry into effect the true intent of the parties. I am not disposed to deny that a case may arise in which it is doubtful, from the language employed in the instrument, whether the parties meant to agree upon the measure of compensation to the injured party in case of a breach. In such cases, there would be room for construction; but certainly none where the meaning of the parties was evident and unmistakable. When they declare, in distinct and unequivocal terms, that they have settled and ascertained the damages to be $500.00, or any other sum, to be paid by either party failing to perform, it seems absurd for a court to tell them that it has looked into the contract and reached the conclusion that no such thing was intended; but that the intention was to name the sum as a penalty to cover any damages that might be proved to have been sustained by a breach of the agreement."

As the stipulation for value referred to was binding upon the parties, the trial court rightly refused to consider evidence tending to show that the admitted value was excessive, and the Circuit Court of Appeals properly gave effect to the expressed intention of the parties.

The decree of the Circuit Court of Appeals was right, and it is therefore

*Affirmed.*