## DAMAGES FOR BREACH OF CONTRACT TO PURCHASE FLOUR.

Common Pleas Court of Hamilton County.

SHEFFIELD-KING MILLING COMPANY V. THE DOMESTIC SCIENCE BAKING COMPANY.*

Decided, June 30, 1914.

*Damages—Rule for Construing Contracts With Reference to Liquidated Damages and Penalties—Contracts Will be Upheld Where the Stipulation for Liquidated Damages Was Fair to Both Parties at the Time it Was Made.*

A stipulation in a contract for the sale and purchase of flour, that in case of breach by the vendee the damage suffered by the vendor should be ascertained by using as a basis the price of wheat at the time of the breach rather than the price of flour, must be treated as a *bona fide* agreement as to liquidated damages and not as providing a penalty in case of a breach, notwithstanding the damages resulting would be considerably larger if based on wheat rather than flour.

*S. K. Henshaw, E. R. Donohue* and *H. L. Hoidale,* for plaintiff.
*Murray Seasongood* and *W. A. Rinckhoff,* contra.

NIPPERT, J.

This is an action brought by plaintiff against the defendant, asking for damages by reason of the defendant failing to comply with the terms of a certain contract which was entered into between the parties on the 2d day of August, 1912, and in which defendant contracted with the plaintiff for a quantity of "Gold Mine" flour equivalent to 4,000 barrels, of the net weight of 196 pounds each, and that said flour was to be packed in jute bags, each to contain 140 pounds net weight, making a total of 5,600 packages; under the terms of said contract it was further provided that plaintiff was to ship said flour to the defend-

*Reversed by the Court of Appeals, 24 C.C.(N.S.), 289; judgment of the Court of Appeals reversed by the Supreme Court and that of the Common Pleas affirmed, 95 Ohio State.

ant at Cincinnati at such times as the defendant might direct between October 1, 1912, and March 1, 1913, and that the plaintiff was to allow the defendant, as a deduction from the purchase price, on each shipment the amount of the freight on said flour from Faribault, Minnesota, to Cincinnati, Ohio, and, further, that the defendant was to pay for all flour shipped at the rate of $4.75 per barrel on the arrival of said shipment at Cincinnati and on being presented with draft for the purchase price, less freight and being tendered a bill of lading therefor.

The contract contained, among other provisions, the following, to-wit:

"Buyer has the privilege, subject to seller's commission, of extending shipping date from time to time an additional thirty days, subject to a carrying charge of five cents per barrel on flour  *  *  *  for each thirty days or fraction thereof, due in advance and payable on demand. Seller shall have three days' notice of each request to extend shipping time limit.

"If buyer fails to furnish directions for shipment within original contract time or prior to date of expiration of extension, seller may

"(1)  Extend contract limit thirty days, subject to carrying charges above specified;

"(2)  Ship the goods at his option within thirty days, exercising his own judgment as to packages if same are not specified; or

"(3)  Terminate contract, in which case the following is agreed upon as the basis of settlement, viz:

"The actual difference between the highest closing price of No. 1 northern wheat in Minneapolis on date of sale and date of cancellation as shown by the 'Minneapolis Market Record,' figuring flour four and one-half bushels of wheat for every barrel of flour, the buyer to reimburse the seller for carrying the wheat at the rate of one cent per bushel per month from the date of sale to date of cancellation, plus two cents per bushel for buying and re-selling the wheat, and two cents per bushel to cover loss of profit, if any, and inconvenience to seller resulting from failure of the buyer to take out flour as per contract.

"Seller is obligated to give buyer five days' notice of his intention to ship or terminate contract; otherwise he is understood to have extended the contract an additional thirty days, subject to carrying charges as above.

"There are no conditions, oral or otherwise, except as stated herein.

"Sales made by traveling men or agents are not binding upon this company until acknowledged from our Minneapolis office."

On or about January 14, 1913, the defendant directed the plaintiff to ship 500 barrels of the 4,000 barrels contracted for, which order plaintiff executed by shipping 250 barrels on January 20, 1913, and 250 barrels on January 23, 1913, making a total of 500 barrels of flour so shipped, and which were accepted and paid for by the defendant.

The defendant failed to furnish shipping directions for the remaining 3,500 barrels of flour prior to March 2, 1913, so that on or about March 6, 1913, plaintiff notified defendant that unless defendant furnished plaintiff with directions for the shipment of all of the remaining 3,500 barrels of flour on or before April 30, 1913, and unless defendant ordered and took out all of said 3,500 barrels of flour on or before April 30, 1913, that the plaintiff would, at the expiration of April 30, 1913, terminate said contract and that on such termination of said contract being made plaintiff would hold defendant liable for loss resulting to it by reason of the failure of defendant to furnish plaintiff with directions for the shipment thereof, as such loss might be calculated under the contract provisions as stated in paragraph No. 3.

On or about April 5, 1913, plaintiff did receive from defendant directions for the shipment of a third carload of flour of 250 barrels, which was shipped to the defendant on April 8, 1913, was accepted by the defendant and paid for, but since that time the defendant has failed and refused to direct the shipment of any more of said flour, and by reason of the failure of the defendant to order out the balance, to-wit, 3,250 barrels, the plaintiff notified the defendant, on May 1, 1913, that the contract had been terminated and further notified the defendant that plaintiff's loss, calculated under provision 3 of the contract, amounted to $4,259.53, for which amount, with interest at the rate of six per cent., plaintiff prayed judgment.

Clause No. 3 of the contract reads as follows:

"If contract is terminated the following is agreed upon as the basis of settlement, viz.: The actual difference between the

highest closing price of No. 1 Northern Minneapolis wheat on date of sale and date of cancellation as shown by the 'Minneapolis Market Record,' figuring flour four and one-half bushels of wheat to every barrel of flour; the buyer to reimburse the seller for carrying the wheat at the rate of one cent per bushel from date of sale to date of cancellation, plus two cents per bushel for buying and re-selling the wheat, and two cents per bushel to cover loss of profit, if any, and inconvenience to seller resulting from failure to take out flour as per contract.''

Counsel for defendant contends that the measure of damages should be the difference in the value of the *flour* at the time the Domestic Science Baking Company at Cincinnati contracted to buy the same, that is, on August 2, 1912, and the value of the flour at the time the contract was violated, while counsel for plaintiff maintains that the terms of the contract set out specifically what the measure of damages should be in case of breach, viz., the difference in the price of *wheat* on August 2, 1912, and April 1, 1913, etc.

We are called upon to interpret this contract. If the contract is one for liquidated damages, then plaintiff's interpretation of the agreement is correct; if the contract is one which would not only make plaintiff whole by reason of its breach, but in addition thereto would penalize the defendant for failing to carry out the agreement, then the contract would provide for a penalty and the proposed interpretation of plaintiff ought not prevail.

The question raised in this case is not without its difficulties by reason of the fact that the basis of fixing the damages is not the difference in price of the *manufactured* article on contract date (August 2, 1912) and the date of its breach (May 1, 1913), but the damage is fixed by the difference in price of the raw material out of which the manufactured article is made.

The law will permit parties to determine by agreement what shall be the damages which he who violates the contract shall pay to the other, but the law does not always sanction or enforce such an agreement. Such damages as have been beforehand agreed upon, if sanctioned by law, are called *liquidated damages,* and plaintiff claims that the case at bar comes within that class.

But where the parties make such an agreement, but not in such a manner that the law adopts it, then such damages thus agreed upon are a penalty or in the nature of a penalty. The sum agreed upon will be treated as a penalty, unless it is payable for an injury of uncertain amount and extent; that is to say, where, among all the possibilities of injury resulting from breach of contract, it is impossible to select the certain or probable results.

In the latter case, the parties may agree upon beforehand what shall be taken as a compensation, and such an agreement for liquidated damages the court will not set aside unless it is out of proportion to all rational expectation of injury. (See *Parson on Contract*, Volume III, pages 158-161.)

Thus, in the case at bar, the defendant feels that it is being penalized under the terms of its agreement with the plaintiff, Sheffield-King Milling Company, if the court should find that the difference in the price of wheat on the respective dates is to be the basis of compensation for breach. The defendant claims that the price of *flour*, the commodity which it purchased, and not the price of wheat, should prevail.

Both parties to the contract are responsible firms doing a large business in their respective lines—the plaintiff company being an extensive purchaser of the raw material (wheat) which its mills turn into the commodity of flour, of which it produces several thousand barrels every day, and ships it to all parts of the country, mainly wholesale grocers and bakers. The defendant company is a large wholesale baking company, doing an extensive business in southern Ohio, and both the defendant and plaintiff ought to be thoroughly familiar with their respective line of commercial enterprise, its hazards, risks, profits and possible losses.

The defendant company knew, of course, that the plaintiff, being in the business of milling wheat into flour, had to be in the market each day of the year for the purpose of purchasing the raw product for its mill in order to fill the demands of its customers. The plaintiff, on the other hand, knew that under the terms of its contract the defendant company had the privilege and right to call upon it for the full quota of 4,000 barrels of flour at any time on or after October 1, 1912, and in case plaint-

iff failed to respond or was unable to respond to defendant's demands under the contract that plaintiff would be liable to defendant in damages, though in this instance the method of computing such breach on plaintiff's part was not set out in the agreement. Plaintiff, however, did fix the method by which its damages should be ascertained in case the Domestic Science Baking Company of Cincinnati failed to live up to the terms of the contract.

In this instance the milling company fixed wheat (*i. e.*, the raw material) as its standard for liquidated damages in a contract accepted by defendant, while the baking company contended that the value of flour (*i. e.*, the finished product) should be considered the basis of fixing damages.

In 92 Fed., 486, Judge Sanborn of the Eighth Circuit, in the case of *Kingman* v. *Western Electric Mfg. Co.*, lays down the following rule for breach of contract of sale of goods to be manufactured:

"The measure of damages for a breach of a contract to purchase personal property is the difference between the market value and the contract price of the property at the time of the breach, if the latter be greater than the former."

This rule would, no doubt, apply in the case at bar if there had not been an *express* stipulation to the effect that the damages for breach should be the difference in the market price of the raw material, *wheat,* and not of the manufactured article, *flour,* as of August 2, 1912, and May 1, 1913.

That flour is a perishable product is well known and that it is more susceptible than wheat to the changes of heat and cold, wet and dry, to the attacks and ravages of various kinds of insects, is also true. It is also conceded that a milling company would not manufacture 3,000 to 4,000 barrels of flour without an express order for their shipment and run the risk of having the product thrown back on its hands at a place one thousand miles from the company's elevator and thus be compelled to sell the consignment as "distress flour" on the open market at a loss that could not be estimated or foreseen at the time of the making of the contract; while, on the other hand, no such contingency

as "distress wheat" could arise in the market of a raw material such as wheat.

The parties to this contract met and agreed upon a fixed *method*, not a fixed *sum*, of figuring damages in case of breach. These damages might have come high or they might have been low, all depending on the wheat market of August 2, 1912, and May 1, 1913, or there might not be any damage at all; in fact, there might have been profit accruing to defendant if the wheat market had gone up instead of down. Unfortunately for the defendant, wheat had dropped from $1.03 per bushel on August 2, 1912, to $.84 per bushel on May 1st, 1913, and plaintiff's loss on raw material purchased on August 2, 1912, to fill this order of defendant's was severe—firstly due to drop in price of wheat, and, secondly, due to failure of defendant to live up to the terms of its contract. If wheat had only gone down one cent per bushel defendant's loss would have been trivial, but having gone down nineteen cents per bushel his loss was correspondingly heavier, and it is fair to assume that if wheat had gone *higher* than $1.03 per bushel the defendant would have never repudiated the contract.

One of the tests applied in cases of this nature is whether the amount stipulated for in the contract is greatly in excess of the actual damages or not, and it is held where this test is applied that if the amount stipulated is no greater than the actual damages, or if in excess of actual damages such excess is moderate, the stipulation is for liquidated damages. But where this test is applied it is the facts as they exist when the contract is made and not those in existence when the contract is violated which must be considered in determining whether the amount stipulated for is reasonable or unreasonable. See *Gibson* v. *Oliver*, 158 Pa. St., 277.

In the case at bar the facts as they existed on the 2d day of August, 1912, were not of such a nature as to lead this court to say, that either the method of arriving at the damages for breach was unreasonable, or that the amount in case of breach would be an unreasonable amount. It was a fair method by means of which the parties could reach by agreement the exact amount in dollars and cents of the damages in which defendant would have to respond to plaintiff in case of breach.

Was it the intention of the parties at the time of entering upon this contract that they should then estimate in advance the actual loss accruing to plaintiff in case of breach?

Our Supreme Court, in *Doan* v. *Rogan,* 79 Ohio St., 372, held:

"Whether a stipulation providing for liquidated damages for the breach of a contract is to be construed as liquidated damages or as a penalty depends upon the intention of the parties to be gathered from the entire instrument. While courts will not construe contracts in a way authorizing recovery for liquidated damages simply because the parties have used that term in the agreement, yet where parties to a contract otherwise valid have in terms provided that the damages of the injured party by a breach on the part of the other of some particular stipulation, or for a total breach, shall be a certain sum specified as liquidated damages, and it is apparent that damages from such breach would be uncertain as to amount and difficult of proof, and the contract taken as a whole is not so manifestly unreasonable and disproportionate as to justify the conclusion that it does not truly express the intention of the parties, but is consistent with the conclusion that it was their intention that damages in the amount stated should follow such breach, courts should give effect to the will of the parties as so expressed and enforce that part of the agreement the same as any other."

It is true that a provision in a contract for the payment of a fixed sum for its breach, whether as a penalty or liquidated damages, will not be enforced where it appears no damage has been sustained. See 197 Fed., 661.

The Supreme Court of Alabama, in the case of *Keeble* v. *Keeble,* 85 Ala., 552, has laid down some admirable rules in construing a stipulation in a written contract for the payment of a specified sum of money on a contingency, with a view to determine whether it is to be regarded as liquidated damages or as a penalty.

"1.   The court will always seek to ascertain the true and real intention of the contracting parties, giving due weight to the language or words used in the contract, but not always being absolutely controlled by them, when the enforcement of such contract operates with unconscionable hardship, or otherwise works an injustice."

It may be contended by the defendant in the case at bar that strict enforcement of the terms of this contract would be en-

tirely out of proportion to the actual loss sustained, but the court in the Keeble case, paragraph 8, states the law as follows:

"Whether the sum agreed to be paid is out of proportion to the actual damages which will probably be sustained by a breach, is a fact into which the court will not enter on inquiry, if the intent is otherwise made clear that liquidated damages, and not a penalty, is in contemplation."

The court in the Keeble case states specifically that the law will not enter upon an investigation as to the quantum of damages in such cases, as this is the very matter that was settled by agreement between the parties themselves, and if the act agreed not to be done is one from which damages incapable of ascertainment except by conjecture, are liable to follow, sometimes more and sometimes less, according to peculiar circumstances, the court will not stop to investigate the extent of the grievance complained of as a total breach, but will accept the method agreed upon as the basis of a proper and just measurement by way of liquidated damages, and this is true unless the real intention of the parties under the rules laid down by our courts design it as a penalty.

It was easy to ascertain the difference in the market value of wheat on August 2, 1912, and May 1, 1913, while it would be a difficult matter to ascertain the loss that might be sustained by plaintiff in case the flour should be substituted for wheat as the standard in fixing damages.

The question presented to the court in the case at bar is to be determined only by an examination of the contract. It is no doubt the rule that where a contract for the manufacture and delivery of goods is repudiated by the vendee before the goods are manufactured, the measure of the vendor's damages is the difference between the cost of manufacture and delivery and the contract price. *Kingland* v. *Western Mfg. Co.*, 92 Fed., 486; *Hadley Glass Co.* v. *Highland Glass Co.*, 143 Fed., 242; *Delker Company* v. *Hess Spring Axle Co.*, 138 Fed., 638.

But this is only true in cases where there is no stipulated agreement as to the *modus operandi* which must be pursued by the parties in case of breach. One must consider in this connection the undisputed fact that there was as much chance for

the wheat to *increase* in value after the 2d day of August, 1912, as there was for wheat to *decrease* in value; and if it had increased in value the defendant at bar would be entitled to reap the benefit of this increase and there would certainly not have been a breach on his part.

Our circuit court, in the case of *Jacobs* v. *Shannon Furniture Company*, 13 C.C.(N.S.), 142, laid down the rule as to whether the amount stipulated for is a fair and reasonable measure of contemplated damages or manifestly excessive, as follows:

"This question must be viewed by the court from the standpoint of the parties at the *time of the contract* and *not ex post facto* when the litigation is up for trial. Contracts are always so construed and a stipulation for liquidated damages is no exception."

The courts will invariably follow this rule, and such an agreement for liquidated damages is conclusive upon the parties in the absence of fraud or mutual mistake, and a *bona fide* stipulation agreed upon between the parties at the time of the entering into of this contract is binding upon both parties whether the wheat has increased or decreased in value, and this court will refuse to consider evidence tending to show that the amount which defendant is liable for if this contract is enforced would be excessive. See *Sun Ptg. Co.* v. *Moore*, 183 U. S., 642, 672; 64 Ohio St., 361, 367.

To quote from *Blasting Co.* v. *Stone Co.*, 64 Ohio St., 367:

"The parties themselves best know what their expectations are in regard to the advantages of their undertaking and the damages attendant on its failure; and when they have mutually agreed on the amount of such damages in good faith and without illegality, it is as much the duty of the court to enforce that agreement as it is the other provisions of the contract."

Our Supreme Court, quoting from *Dwinel* v. *Brown*, 54 Maine, 468, embodies the following comment:

"It is the province of the court to uphold existing contracts, not to make new ones. It is not for the court to sit in judgment upon the wisdom or folly of the parties in making the contract, when their intention is clearly expressed and there is no fraud

or illegality. No judges, however eminent, can place themselves in the place or position of the parties when the contract was made, scan the motives and weigh the considerations which influenced them in the transaction, so as to determine what would have been best for them to do, who was least sagacious or who drove the best bargain. * * * The interests of the public are quite as likely to be subserved in maintaining the inviolability of contracts as they are in contriving ways and means to make a contract mean what is not apparent on the face of it to save a party from some conjectural inequity growing out of the supposed inadvertence or improvidence.''

Defendant's counsel, in his very able brief, has referred to the Ohio sales act, Section 8444, but the sales act is not applicable to the case at bar, as the parties in this case entered into specific stipulations in case of breach.

It is therefore the opinion of this court that the provisions of the contract entered into between these parties on August 2, 1912, are to be construed as ''liquidated damages'' and are not to be considered in the light of a penalty. Motion for new trial will be overruled and judgment may be entered for plaintiff company in accord with the above.