## NICHOLSON TRANSIT CO. v. NICHOLSON-UNIVERSAL S. S. CO.

### No. 9469.

District Court, E. D. Michigan, S. D.

Aug. 16, 1930.

Bigham, Englar, Jones & Houston, of New York City, and Miller, Canfield, Paddock & Stone, of Detroit, Mich., for libelant

Warren, Hill & Hamblen, of Detroit Mich., for respondent.

TUTTLE, District Judge.

This is a suit on a charter party brought in the name of Nicholson Transit Company, owner of the steamer City of Bangor, to recover the value of the vessel from Nicholson-Universal Steamship Company, the charterer. The suit arises out of the stranding of the City of Bangor on Keweenaw Point, Lake Superior, on November 30, 1926, and her resulting total loss; and is in fact brought by underwriters, but in the name of Nicholson Transit Company—as under the law underwriters have the right to do—for the purpose of recovering from the charterer the amount of the insurance or moneys paid by underwriters to the owner by reason of the said loss.

It appears from the evidence that libelant Nicholson Transit Company, after carrying on business for a number of years as a partnership at Detroit, Mich., was organized as a corporation in 1923. At that time libelant owned four vessels which it operated on the Great Lakes in the business of transporting automobiles by water. One of its competitors, likewise located at Detroit, was a corporation known as Universal Steamship Company. This latter company was also engaged in the water carriage of package freight, but unlike Nicholson Transit Company, it did not own any vessels, instead car-

rying on its business by means of chartered vessels.

In 1924 Nicholson Transit Company and Universal Steamship Company decided that it would be to their mutual advantage to join forces, and to effect that purpose they formed an operating company which, taking its name from the parent companies, they called Nicholson-Universal Steamship Company and which is the respondent in this case. Nicholson-Universal Steamship Company was organized with a capital stock of $40,000, one-half of which was owned by Nicholson Transit Company, the named libelant herein, and the other one-half by Universal Steamship Company. The parent companies also had equal representation on the board of directors and in the filling of the offices and in the management of the new company, and after its organization, although the old companies retained their separate identity as corporations, the transportation business of the old companies was carried on by Nicholson-Universal Steamship Company, which is well described as the operating company of the parent organization.

On the organization of Nicholson-Universal Steamship Company, the vessels owned by libelant were chartered to respondent and as additional vessels were acquired by libelant these, too, were placed under charter to respondent. In the latter part of 1925 and the forepart of 1926, libelant acquired three more vessels, the steamer City of Bangor, which is involved in this suit, and the steamers Penobscot and Thomas Davidson. By charter party dated May 21, 1926, those vessels were also chartered by libelant to respondent, the period of the charter covering midnight, April 15, 1926, to midnight, November 30, 1926, with the privilege of an additional fifteen days, provided certain requirements in respect to post season insurance were complied with by the charterer. This charter provided, in part, as follows:

"(3) The charterer agrees that it will pay all costs of operation, care and maintenance of said steamers of every kind and description during the term aforesaid, including the wages of licensed officers and crew, cost of fuel, oil, grease, engineer's supplies, and all supplies necessary or proper for the steward's department, supplies for the mate's department, towing expenses, repairs and upkeep of said vessels and equipment. The charterer also agrees to pay all expense of fit-out and of laying up said vessels for the year 1926 and further agrees to pay the expense and cost of surveying and classification of said vessels. Any items of repairs paid by the charterer and for which said owner receives reimbursement from its underwriters will be repaid to said charterer when and as received.

"(4) The charterer further agrees at the expiration of the charter to repair and replace all equipment found to be damaged or missing, in order that said equipment shall be as full and complete and in as good condition, ordinary wear and tear excepted, as at the beginning of said charter, or else to pay the value of or repairs to said equipment.

"(5) The charterer further agrees to permit the owner through its authorized representatives to inspect said vessels from time to time for the purpose of ascertaining that they are being maintained by said charterer in a careful and efficient manner. Said charterer agrees specifically to carry out any orders or directions which it or said owner may receive, from said steamers' underwriters or their representatives, whether the carrying out of said order or direction interrupts service or not. Said charterer further agrees that it will not do or permit any act or thing or be guilty of any omission which will in anywise invalidate the insurance on said steamers or prevent the collection of any indemnities or claims thereunder.

"(6) The charterer agrees that it will procure and pay for full marine insurance as well as fire, P & I., and disbursements insurance covering said steamers 'City of Bangor,' 'Penobscot,' 'Thomas Davidson' and their owner for the term of this charter; said insurance to be in form and amount satisfactory to the owner and run to the owner, and to be placed with such broker or brokers as shall be satisfactory to the owner.

"(7) The parties hereto expressly agree that if said steamers 'City of Bangor,' 'Penobscot,' or 'Thomas Davidson,' or any of them should, prior to the termination of this charter, become a total loss, then and in such event this charter shall as of the date of such total loss be at an end in so far as said vessel or vessels which have become a total loss are concerned, and the charterers shall from such date be relieved from the payment of further charter moneys payable hereunder for said vessel or vessels which have become a total loss, except such moneys as may be due and unpaid at the time of said loss, and this charter shall remain in full force and effect as to any vessel or vessels which have not become a total loss.

"(8) The charterer agrees that it will not suffer or permit to be continued any lien or encumbrance of any character upon or

against the said steamers, or any of them, (excepting liens and encumbrances existing prior to the delivery of the steamers hereunder), which has or might have priority over title and interest of the owner of said steamers; and said charterer agrees that it will keep said steamers free and clear of all debts, claims or liens whatsoever during said term, and that upon the termination of this charter, whether by limitation or otherwise, it will return said steamers to said owner at the Port of Detroit, Michigan, in like good order and condition as when taken, ordinary wear and tear excepted, prior to the close of navigation for the season of 1926, and said charterer further agrees to fully indemnify and protect said steamers and their owner against any and all claims or liens that may be asserted during the term hereof or thereafter, through or on account of said charter or the use or operation of said steamers by said charterer, its agents or employees. * * *

"(10) It is mutually agreed by the parties hereto that the right to operate said steamers 'City of Bangor,' 'Penobscot' and /or 'Thomas Davidson' under this charter shall terminate absolutely and no voyage shall be started by any of said steamers later than the 30th day of November unless full post season insurance to the amounts and in form as aforesaid is obtained and paid for by said charterer, covering the steamer or steamers which said charterer desires to operate, in which event said charter may be extended as to the steamer or steamers desired to be so operated, without additional compensation for an additional period of fifteen (15) days and during the period of such post season insurance."

Possession of the City of Bangor was duly surrendered to the charterer by the owner, and during the season of 1926 the vessel was operated by the charterer, the respondent herein. Prior to taking possession of the City of Bangor, respondent in pursuance to the provisions of paragraph 6 of the charter procured the insurance therein provided for, including marine insurance in the amount of $350,000, of which amount $279,500 was hull insurance and $70,500 was what is known as disbursements insurance or insurance against total loss only. The insureds named in the policies were Nicholson Transit Company and Guardian Trust Company of Detroit, the latter being the trustee under a preferred mortgage securing a bond issue covering the vessel. The premium for this insurance amounting to approximately $10,000 was paid by respondent, and it is admitted that the insurance was in form and amount satisfactory to the owner.

On November 30, 1926, the City of Bangor, while in the possession of and being operated by respondent under the charter, stranded on Keweenaw Point, Lake Superior. Libelant immediately sent two of its officers to Keweenaw Point to make an examination of the wreck, and on December 9, 1926, following this examination and being of the opinion that the vessel was a total loss, libelant telegraphed the insurance brokers who had placed the insurance to give notice of abandonment of the wreck to all underwriters, which the brokers did on the same day by telegraph. Later by letter dated December 23, 1926, addressed to all of the underwriters concerned, libelant confirmed the telegraphic notice of abandonment which had been given by the brokers and formally abandoned the vessel to underwriters as a total loss. Libelant then requested the trustee under the bond issue to join with it in the execution of proofs of loss, and on January 18, 1927, proofs of loss were executed by the owner and the trustee and forwarded to underwriters. These proofs of loss consisted of a printed form reciting, among other things, that the vessel had been lost by reason of perils insured against, to which was attached, as a part of the proofs of loss, a certified copy of the marine protest extended by the crew of the vessel, a certified copy of the vessel's enrollment, and a certified copy of the report of survey made by the surveyor who had examined the wreck on behalf of underwriters.

The abandonment was declined by underwriters pending a further examination of the wreck to be made the following spring. The further survey was made in May, 1927, and as a result of this survey underwriters agreed to pay a total loss under the policies of hull and disbursements insurance, and during June, 1927, the various underwriters duly paid the amount of their respective policies or a total of $350,000. The insurance checks were made payable to libelant and the trustee under the bond issue jointly and were in the first instance delivered to the trustee. Out of the proceeds of the checks the trustee, pursuant to instructions from Nicholson Transit Company, retired the balance of the bond issue, including interest, and then turned over to Nicholson Transit Company the remainder of the insurance, or approximately $244,000, together with a discharge of the mortgage. Thereafter, underwriters sold the wreck to other

parties for $5,250, and at the request of underwriters, Nicholson Transit Company executed a bill of sale running to the purchaser.

So far as the named libelant is concerned, no demand was ever made on respondent by reason of this loss, and the suit, as stated, is brought by underwriters in the name of libelant but for their own benefit. There are no disputed questions of fact and by reason of admissions made on the record the issues are narrowed to one question of whether, under the charter provisions, collection by Nicholson Transit Company of a total loss in the amount of $350,000 from underwriters relieved respondent from liability to replace the vessel or pay her value.

It is the theory of libelant, or rather of the underwriters, that this vessel was received by the charterer under a direct covenant to return her in as good condition as when received, ordinary wear and tear excepted; that because of the stranding and her resulting total loss she has not been returned; that the cause of the stranding has not been explained; that the owner of the vessel is therefore entitled to recover her full value from the charterer and that by the right of subrogation underwriters are entitled to this recovery, it being agreed by all of the parties that the value of the City of Bangor at the time of and just before the stranding was not more than the amount of the insurance paid. The fact that respondent has not attempted to show that the stranding and resulting loss was without negligence on its part is not material to the issues of the case, for it seems to be agreed by both of the parties that except as respondent may be relieved by its defense on the question of insurance the charter constitutes an absolute agreement to return the vessel in the same condition as when received, ordinary wear and tear excepted. As put by libelant in argument, whether there was or was not negligence is beside the issue, because there was a direct covenant to return the ship whether the loss was the result of negligence or whether without negligence. In other words, a defense of lack of negligence, even if proved, would be of no avail, to respondent.

In support of its position that the charterer covenanted absolutely to return the vessel or in default thereof pay her value, libelant has cited Sun Printing & Publishing Association v. Moore, 183 U. S. 642, 22 S. Ct. 240, 46 L. Ed. 366, and has called attention to the marked similarity between the language of the charter considered by the Supreme Court in that case and the language of the charter now under consideration, particularly the language of paragraph 3. In that paragraph the charterer agreed, among other things, to pay the cost of all repairs. In the Sun Printing Case the charterer made a similar agreement, and it was held that the agreement to make repairs imported not only the duty of making good any partial damages but also a total loss, that it constituted a covenant by the charterer to return the ship in any event, and that the ship having been lost, regardless of the cause of the loss the charterer was liable for the full value of the ship. I take it that is the law and that libelant is entitled to recover in this case unless by the terms of the charter party it was agreed between the owner and the charterer that any insurance paid by underwriters should inure, as between the owner and the charterer, to the benefit of the latter and to the extent of any insurance so collected relieve the charterer from liability for partial loss, or in event of total loss, from replacing the ship or paying her value.

During the season of 1926 three small misfortunes overtook the vessels covered by this charter, one of the misfortunes occurring to the very ship with which we are concerned, the City of Bangor. On each occasion repairs were made by the charterer, the cost of the repairs varying from over $3,000 in one instance to over $11,000 in another instance. On each occasion the owner presented a claim to underwriters and received the proper amount of insurance from underwriters under the policies, and on each occasion the owner turned the collections from underwriters over to the charterer for the purpose of reimbursing the charterer to the extent of the insurance collected. Then on the last day of the regular period of the charter, November 30, 1926, the City of Bangor stranded on Keweenaw Point, Lake Superior, and was so nearly a total loss that her owner abandoned her to underwriters as a total loss, and the following spring the underwriters paid the owner the full amount of the insurance and sold the wreck for what they could get for it, which was the sum of $5,200.

It is conceded by libelant that the owner, in turning over to the charterer the insurance collected in respect to the three small misfortunes referred to, was acting in accordance with the provisions of the charter; that under the terms of the charter, as between the owner and the charterer, the latter was

entitled to the benefit of those collections. Libelant further concedes that the same result would follow if the damage had amounted to as much as 50 per cent. of the value of the vessel. But when the vessel becomes a total loss it then is libelant's contention that the insurance provisions of the charter afford respondent no protection; that in the present case, even though the owner collected a total loss from the underwriters, respondent is not entitled to any benefit from the insurance but is liable in full to the owner for the value of the ship. On the part of respondent it is contended that as between the owner and the charterer any insurance paid by underwriters, whether for a total or a partial loss, was to inure to the benefit of the charterer and relieve it to the extent of the insurance so collected from liability to pay the value of the vessel or the cost of the repairs, as the case might be. It is not disputed that the loss was by stranding and within the coverage of the insurance; it is conceded that an agreement such as respondent contends was made would be a valid enforceable agreement, one which the owner and the charterer had a legal right to make; and as I gather it from the able lengthy arguments to which I have listened, there seems to be agreement that the matter resolves itself solely into an interpretation of the charter for the purpose of gathering from it the intent of the parties.

So it becomes necessary to take this charter party and analyze it and, not from any one line, sentence, or paragraph, but from its four corners, ascertain what the agreement was between the owner and the charterer, interpreting the agreement in the light of the relation between the parties, the thing they were dealing with, and the problem they had before them.

The history of the relations between the owner and the charterer is only of interest and importance for such bearing as it may have upon the relationship of the parties at the time this charter was made and the thought as to whether or not they dealt together as people deal who are at arm's length, or whether at the reverse. I think that is a matter that courts should have in mind in interpreting contracts. I have in mind the language used in Nash v. Towne, 5 Wall. (72 U. S.) 689, page 699, 18 L. Ed. 527:

"Courts, in the construction of contracts, look to the language employed, the subject-matter, and the surrounding circumstances. They are never shut out from the same light which the parties enjoyed when the contract was executed, and, in that view, they are entitled to place themselves in the same situation as the parties who made the contract, so as to view the circumstances as they viewed them, and so to judge of the meaning of the words and of the correct application of the language to the things described."

And in Reed v. Insurance Co., 95 U. S. 23, 30, 24 L. Ed. 348:

"Although a written agreement cannot be varied (by addition or subtraction) by proof of the circumstances out of which it grew and which surrounded its adoption, yet such circumstances are constantly resorted to for the purpose of ascertaining the subject-matter and the stand-point of the parties in relation thereto. Without some knowledge derived from such evidence, it would be impossible to comprehend the meaning of an instrument, or the effect to be given to the words of which it is composed. This preliminary knowledge is as indispensable as that of the language in which the instrument is written. A reference to the actual condition of things at the time, as they appeared to the parties themselves, is often necessary to prevent the court, in construing their language, from falling into mistakes and even absurdities."

If the contract is between a father and a son, we study and interpret it in the light of those family relations and that they dealt together in those close family relations. We have the surrounding circumstances in mind with insurance companies where they deal with their assureds with fixed forms. We find this all the way along through the law. We have the relations between the parties in mind, not only for the purpose of getting the background and interpreting the contract in the light of those relations, but also as to which way the court will lean in interpreting the contract if there is doubt. So I think it is something that should be had in mind, that it is proper for the court to have in mind the situation as it was at the time this charter party with which we are concerned was entered into.

Going back prior to the charter of the "City of Bangor" which was signed in May, 1926, going back a little way beyond that to 1923, we have two companies doing business at Detroit, one Nicholson Transit Company and the other Universal Steamship Company; both engaged in the transportation of automobiles by water. The principal difference was that Nicholson Transit Company owned the ships which it used, whereas Universal Steamship Company carried on

business by means of chartered ships and also engaged in the transporting of package freight. Then we come to the season of 1924 when these two companies, after deciding that it would be to their mutual benefit to join forces, organized an operating company which they called Nicholson-Universal Steamship Company, the respondent in this case. Each of the parent companies owned 50 per cent. of the capital stock of the operating company and had equal representation on its board of directors and in its offices and management. The operating company chartered the four vessels of Nicholson Transit Company, and ·as the latter acquired additional vessels they, too, were chartered to respondent, including the steamer "City of Bangor," with which we are concerned in this case. And while Nicholson Transit Company continued to own the ships, they were all under charter to Nicholson-Universal Steamship Company, in which Nicholson Transit Company owned one-half of the capital stock. The parent companies kept their separate identities, there is no question about that, and undoubtedly, as pointed out by libelant, it was for purposes of liability; but in reading this charter party the court must nevertheless have in mind that so far as Nicholson Transit Company was represented on the board of directors and in the offices and management of Nicholson-Universal Steamship Company, those officers and directors were dealing with themselves and that the whole thing was an interlocking proposition, a family affair.

Under the charter party, speaking generally, it is plain that the parties had in mind the subject of insurance and the protection that comes from insurance. No one can read the contract without recognizing this fact. Do we find anything in this charter party from which it can be found that the charterer was not to pay the owner for damage done to the vessel or for her loss, or, what would tend to the same result in this particular case, was there an agreement that the insurance paid by the underwriters should inure, as between the owner and the charterer, to the benefit of the charterer and to the extent of any insurance collected relieve the charterer from liability to make good the ·damage or pay the value of the vessel as the case might be.

The underwriters were not a party to the charter; it is admitted that through subrogation they take only such rights as Nicholson Transit Company had, that they must accept the charter as they found it. So when we talk about the meeting of the minds of the parties and about the intent of· the parties, we are talking about the meeting of the minds of the owner and the charterer and the intent of the owner and the charterer. What was it upon which their minds met? The thing with which we are interested in that regard, and the only thing, is the matter of insurance. Other things creep in, but all for the purpose of finding out what it was that the parties agreed upon on the subject of insurance. We are forced to have in mind that if the subject of insurance had been left out of the charter then respondent would be liable and would have to pay the owner the value of the ship regardless of how she was lost.

I have read this charter many times and have attempted to analyze it, and I have also read it and attempted to get a general impression as to what it was the parties' minds met upon, if they did meet, on this subject of insurance. In reading the charter as a whole and without trying to pause and analyze each sentence, but reading it through and trying to read it as business men would read it and sign it and understand it, I receive the general impression that it was their intention to allow the charterer to enjoy the benefits of the insurance money paid to the owner. I receive this impression from a reading of the whole charter without stopping here and there to weigh ·each sentence. Then, as I analyze the various sections and study them carefully, one arguing perhaps one way and one the other, the reasonable interpretation, it seems to me, leads in the same direction. It is only when I pause at some one sentence and interpret it in a narrow technical way that I reach the other conclusion. In reading this charter one cannot help but know that the parties were thinking about insurance and about mutual protection by insurance. I have in mind that it is not the duty of the court to make agreements for people. They make their own bargains and their own contracts, and the court simply interprets and enforces them; but a court should be reluctant to interpret a contract in a way that would make it an ·unreasonable, unnatural, and absurd bargain unless the plain meaning of the contract requires such an interpretation.

The interpretation of this agreement urged by libelant would lead to the conclusion that the contracting parties were either stupid or mistaken. The interpretation contended for by respondent would simply make them ordinarily intelligent and careful. They were dealing with the subject of insurance, and it is admitted that if the parties so de-

sired it was entirely within their power to agree that a loss of this kind should be borne by the underwriters. The parties had a legal right to make such an agreement, and every motive in the world prompted them to do so, and not one single motive leads in the other direction. No motive has been suggested to prompt either of the contracting parties to make an agreement having the meaning which libelant claims should be given to this charter party, whereas there were many disadvantages to come to the parties individually and jointly if they did not make an agreement which gave to the charterer the protection of the insurance.

The charterer agreed to procure and pay for the insurance and did procure and pay for it, but libelant asserts that this fact cannot benefit the charterer. In support of this assertion libelant cites White v. Upper Hudson Stone Co. (C. C. A.) 248 F. 893, referred to in the argument as the "rider" case. I compliment counsel on both sides for their diligence in presenting cases to me; every case cited was properly cited and has some bearing on the legal questions involved. The so-called "rider" case is the only one construing a charter party that even approaches similarity to the charter party in the case at bar, but in my opinion the "rider" case is quite different on its facts and should be distinguished.

In the case at bar the charterer paid for all of the insurance, which did not happen in the "rider" case. In the case at bar the charterer admittedly by the terms of the charter was to receive some benefit from the insurance, but in the "rider" case there was no provision giving the charterer any benefit from the insurance or any indication that the charterer was interested at all in the subject of insurance. In that case the charterer did not agree to pay the usual ordinary insurance, but if he took the scow outside of the harbor limits the charter provided that he should pay the small additional premium required to keep the regular insurance in effect. This little added expense did not bring any added protection to the owner over what the owner would have had if the charterer had kept the scow within the harbor limits for which she was chartered; the only purpose of the small extra premium which the charterer paid was to keep the insurance of the owner in effect if the vessel was taken without the harbor limits. If the scow had been lost in the harbor the charterer would not have received any benefit from the insurance, and if lost while without the harbor there was no agreement that the charterer was to receive any benefit on account of the small extra premium which he had paid. In the case at bar the charterer paid for all of the insurance, and it is conceded that there was an agreement that it was to have some benefit from the insurance. Another distinction between these cases is that in the "rider" case the charterer claimed that he was an insured under the policies even though not named therein; that is, that there was a contractual relation between the underwriters and the charterer whereas in the present case the defense is that as between the owner and the charterer it was agreed that the charterer should be relieved from liability to the owner to the extent to which the owner collected from the underwriters. Such an agreement it is admitted would be a valid agreement even though in effect it cuts off underwriters' right of subrogation. So when the "rider" case is studied and analyzed it has no application in the interpretation of the charter which I have before me.

In the case at bar the charterer paid for all of the insurance and admittedly was to benefit from it. If the "City of Bangor" had stranded on the same reef at the same point in identically the same way in midsummer of 1926, and the vessel had been damaged to 50 per cent. of her value, and the charterer had repaired the ship and the owner had presented a claim to underwriters and had received the insurance from underwriters, that insurance money admittedly would have gone, by the terms of the charter party, to reimburse the charterer for the moneys paid out in making such repairs. It is conceded that this would be the situation unless the vessel became a total loss, but on the happening of such an event libelant contends that the parties to this contract, each of whom was interested in saving the insurance money, made an agreement between themselves of such nature that when a total loss occurred, that when the greatest need for protection came, the charterer was to receive no benefit from the insurance for which it had paid and that the underwriters having paid a total loss are entitled by subrogation to recover from the charterer. That is what leads me to the conclusion and to the remarks earlier made. It seems to me an absurd interpretation to say that if the ship were damaged to the extent that she was a total loss then the charterer was to receive no protection from the insurance. The court ought not to interpret the charter in such a way unless it is made necessary by the plain language of the contract. It would be such an unreasonable bargain for intelligent men to make

that, if the language of the charter permits, the court ought to interpret it in the way that reasonable men would think and would act. While the burden of this defense rests upon the respondent, it seems to me that when it comes to a contention of that kind common sense creates a presumption.

Adverting to Sun Printing & Publishing Association v. Moore, supra, cited by libelant, I think that case argues strongly against libelant's interpretation of this charter. In that case one of the things which the charterer agreed to do was to make repairs and the decision of the court in large measure turned on the construction which the court gave to repairs. In interpreting the meaning of the charterer's agreement to make repairs, the court, as has been done in other cases (Ames v. Belden, 17 Barb. [N. Y.] 513; Young v. Leary, 135 N. Y. 569, 32 N. E. 607) looked to the law of landlord and tenant and adopted the interpretation which has been given the similar agreement often found in leasehold contracts. In the law of landlord and tenant it is settled that an agreement by a tenant to make repairs is a covenant not merely to make good partial loss or damage, but if the building is destroyed, even though by fire and without the tenant's negligence, to replace the building or in default thereof to pay its value. By Sun Printing & Publishing Association v. Moore, supra, this interpretation of the covenant to make repairs prevailing in the law of landlord and tenant is now firmly fixed as the interpretation to be given such a provision when found in a charter party. In the present charter the agreement that the charterer is to keep the vessel in repair is found in the first sentence of paragraph 3, and libelant contends that this agreement renders the charterer liable not only to make good partial damages but also to pay for the value of the vessel in event of total loss. In the last sentence of paragraph 3 of the charter the owner agrees that the charterer is to have the benefit of any collections made by the owner from its underwriters in respect to repairs. This agreement libelant admits entitles the charterer to the benefit of the insurance in event of partial damages, but denies that it affords the charterer any protection in case of total loss. In other words, in construing the covenant of the charterer to make repairs libelant gives to repairs the broadest possible interpretation, including the duty to pay for the vessel in event of total loss, but in construing the meaning of repairs when considered in respect to the owner's agreement to give the charterer the benefit of collections from underwriters, libelant seeks a narrow interpretation restricting the meaning to include but partial losses. The charterer's agreement to make repairs and the owner's agreement to give the charterer the benefit of collections from underwriters in respect to repairs are contained in the same paragraph of the charter, and it is clear that the latter agreement grows out of and relates to the former; this libelant in effect concedes by its admission that the charterer is entitled to the benefit of the insurance in case of partial loss. It also seems to me that it is equally clear that the word "repairs" must be given the same construction throughout the paragraph, and as it includes a total as well as a partial loss in the agreement of the charterer, then it must be held to include a total as well as a partial loss as used in the agreement of the owner giving the charterer the benefit of the insurance.

I think that in this charter the parties attempted to define everything that either of them should do. It seems to be really full, complete, and in detail as to what each one should do, and it does not seem to intend to rely on legal constructions and legal rights under the common law, but rather to go further and in a plain way, as men acquainted with each other and familiar with maritime affairs might do, tell what each one was to do. In many respects it points out things to be done that the law ordinarily would require them to do, even if not provided for in the charter. In a charter so drawn the absence of language specifically negativing the necessity to pay for a total loss should not be treated as embodying a legal requirement to pay in event of a total loss.

The charter starts out by providing that the ship is to be turned over by the owner to the charterer, the condition in which it is to be turned over, the period of time for which the charter is to run, and the amount of the charter hire. It then provides for insurance, who is to pay for the insurance, and who is to approve the insurance. It then provides as to repairs, that if they become necessary they are to be made by the charterer, and then it provides that the charterer is to be reimbursed if the owner collects from its underwriters.

The charter then provides (paragraph 7) what is to happen in event of a total loss, and in that paragraph it is specifically provided that the charter shall in such event be at an end. This paragraph next provides that any charter hire due to that date shall be paid and the charterer relieved of paying anything further. If all that had been in-

tended by this paragraph was that the charterer was to be relieved of paying further charter hire, such an intention could have been covered by a simple statement to that effect; but it goes farther and says definitely and before any reference is made to discontinuance of charter hire that in case of total loss the charter shall be at an end. When we study the way this contract is drawn and how it covers the things that each party was to do, even when the law would not have required it, we reach the conclusion that the parties did not intend that the charterer should be required to pay for the ship in case of total loss on the strength of some abstract legal technicality. It seems plain to me that even paragraph 7, which is urged as being against the respondent, in fact weighs in its favor. From the very manner in which the contract is drawn and the relation between the parties to it, it is my view that if it had been intended that the charterer was not to have the benefit of the insurance collected on a total loss, that the charterer should in any event pay the value of the ship in event of a total loss, that the parties would have said so in this paragraph.

I recognize the law to be that in the absence of an agreement the charterer would have to pay for this ship, but the charter party minutely discussed all the things that each party should do and clearly disclosed that the parties intended that the charterer should receive the full protection of the insurance and should not be required to pay for the ship if she became a total loss and the owner collected the insurance from its underwriters. So it is my conclusion and my interpretation of this charter party that it was the intention and the agreement of these two parties, the owner who was 50 per cent. interested in having the insurance inure to the benefit of the charterer, and the charterer, who was 100 per cent. interested in having the insurance inure to its benefit, when they entered into this charter party, read it, and signed it, when their minds met, that they did not mean that the insurance was to inure to the benefit of the charterer simply for accidents and misfortunes falling short of total loss, and that no benefit was to accrue to the charterer if the loss amounted to a full damage, but instead that whether the loss was partial or total that the insurance collected by the owner was to inure to the benefit of the charterer. This charter party should be construed in a common sense way, giving to the language relative to repairs, to total loss and to insurance the meaning which business men would naturally give it and which in respect to repairs the courts have given it.

I hold this charter in truth and in fact provides that the charterer was to receive the benefit of the insurance from the owner as to all damages to the ship which were covered by the insurance, whether the damage was partial or to the extent of total loss, and that the charterer was to be liable to the owner in case of partial loss for only such amount as the loss exceeded the insurance collected and in case of total loss for only such amount as the value of the ship might exceed the insurance collected. In this case, it being agreed that the value of the ship did not exceed the insurance collected, the respondent does not owe anything to the owner or the libelant by reason of the total loss of the "City of Bangor," and a decree will therefore be entered dismissing the libel with the usual costs.