Howell, Judge,
delivered the opinion of the court:
Plaintiff, a corporation of Baltimore, Maryland, as successful bidder, entered into a written contract on September 1, 1939, with the defendant through the District Engineer of the War Department at Jacksonville, Florida, for the rental and operation of a hydraulic dredge, drill boat and other equipment for enlarging an existing levee on the eastern shore of Lake Okeechobee near Canal Point, Florida.
The lease provided that plaintiff would be paid $135 per rental hour for the first four months operating period and $110 per rental hour for any additional rental period thereafter up to six months, making a maximum period of ten months (Par. 1-07 specs., finding 5). Both rates were based upon a guaranteed output of 500 cubic yards per rental hour subject to adjustment on the basis of actual production above or below the guaranteed amount computed on a monthly basis under paragraph 1-08 (b) of the specifications (See finding 5). Under the formula, material in excess of the guaranteed output excavated by the dredge, as determined by borrow pit measurement, was to be paid for at the rate of 100 percent of the unit price and added to the sum earned by plaintiff at the rental rate for the month. On the other hand, if the material excavated was less than the guaranteed output, the deficiency yardage was to be charged against *141 the sum earned by plaintiff at the rate of 125 percent of the unit price.
Plaintiff was also to be paid $80 per hour for pumping water for removing unsuitable materials and $70 per hour for moving the dredge from one location to another.
While the contract was in the form of a lease contract with a stated rental rate per hour, based upon a guaranteed output, both the contracting officer and the Chief of Engineers stated that it was in fact a contract for a unit price of 27 cents per cubic yard with a penalty attached for failure to meet the contract requirements. Plaintiff also understood that the contract called for a penalty in the event of its failure to dredge the guaranteed amount of material.
Pursuant to paragraph 1-07 of the specifications, plaintiff notified the contracting officer in writing on February 2, 1940, that it proposed to terminate the contract after the expiration of the initial four months period, thus fixing March 7,1940, as the contract termination date.
The plaintiff was paid $42,172.36 for its attempt to perform the contract, in connection with which its actual costs amounted to $259,511.92 (See finding 55).
The contracting officer found that the deficiency in dredging progress was due to the failure of plaintiff to blast effectively in the borrow pit prior to dredging rather than to any restrictions imposed with respect to borrow pit width or depth by the contracting officer. This decision was affirmed on appeal except for a change in the method of computing the amount due plaintiff which resulted in an increase of from $3,106.82 previously allowed by the contracting officer to $42,172.36.
Plaintiff in this suit for the costs incurred by it in performing the work, makes the following contentions:
(1) The contract, specifications and drawings indicated no prescribed width or depth of the borrow pit to be excavated and hence plaintiff should have had the right to plan its work with no limitations on the width or depth of the borrow pits so long as it placed in the levee the necessary yardage of material meeting the gradation set out in the specifications; (2) that the contract and specifications stated that in all prior levee work in the area there had been no limita *142 tion as to tbe width or depth of borrow pits; (3) that the specifications stated that the contractor should plan its work and provide its equipment to operate in the borrow pit proposed to be dredged by the contractor; (4) that the specifications also indicated that the prior work done by the Government dredge Welatha would have to be used as a pattern for the work to be performed under this contract; (5) that having all of these factors in mind before bidding, plaintiff planned a borrow pit which would go deeper and place more rock in the levee than had been done by the Welatha \ (6) that its proposed borrow pit met all of the gradation requirements of the specifications, and (7) that before bidding plaintiff had talked with the contracting officer and resident engineer and had not been advised that the contractor would be restricted in the width or depth of the borrow pit.
Finally, plaintiff contends that the provision of the specifications for payment, whereby plaintiff was paid at the rate of 100 percent for extra yardage over the guaranteed output and charged at the rate of 125 percent for any deficiencies below that amount, constitutes a penalty which should not be enforced by this court.
While the findings are rather extensive and necessary to fully describe the situation from which this controversy stems, the main issue is comparatively simple. It involves a difference between plaintiff’s Superintendent Waldeck and defendant’s contracting officer with respect to the construction of certain language in the specifications.
Defendant insisted that plaintiff dredge deeply enough to obtain suitable material consisting of not less than 80 percent by volume of rock, marl, and shell conglomerate (Spec. 4-08) and claimed authority for its position under the contract and specifications, particularly that portion of paragraph 1-12 of the specification which contains this language:
* * * It is the intent that borrow pit cuts shall be dredged box cut form through the overburden into and through the stratified, harder and more desirable levee materials so as to provide the highest percentage of hard and lump materials with the minimum of waste. The contracting officer, through his agents, will stake out ranges and the contractor will be required to drive suitable dredging ranges to control his operations.
*143 We have found (finding 22) that as used and understood in the dredging industry, “bos cut” dredging merely required that the sides of the cut should be perpendicular and not sloped from bottom to top in order to prevent the flattening of the side of the cut in a manner that would permit sloughing in of unsuitable materials.
The words “box cut” in themselves have nothing to do with the width or depth of the borrow pit so that it is possible to perform such a form of dredging by removing materials in layers. This was the method used by plaintiff from time to time during the performance of this contract and condemned by defendant (findings 25-28) for the reason that it not only did not produce the type of material required (80 percent by volume of rock, marl, and shell conglomerate) but if placed in the levee it might leave weak spots which would cause a break during a hurricane.
Plaintiff was equally as insistent that neither the specifications nor plans required any specific width or depth to which the dredge should excavate and pointed to this language in paragraph 1-14 of the specifications:
* * * The contractor must determine for himself the size and capacity of the drill barges required to blast effectively the entire borrow pit area to be worked over. The required output or number of holes which must be drilled and blasted per working day in order to keep well ahead of the dredge is dependent upon the output of the dredge and the width and depth of the borrow pit proposed to be excavated by the contractor. * * *
When plaintiff entered into this contract it knew that the Government meant to require a type of dredging which involved drilling and blasting from two to four layers of rock beneath the bed of the lake. At the time the site of the proposed contract was visited, defendant’s agent admonished plaintiff’s superintendent Waldeck that because the existing levee to be improved had been built of materials obtained by the mere use of a dragline and dredge, certain weaknesses had developed which were sought to be overcome by the use of materials in the rock strata shown on the contract drawings (finding 9).
Plaintiff fully understood that it would be required to drill and blast through the rock strata as was evidenced by the *144 alternate bid (not accepted) submitted along with the accepted bid wherein it said:
As the proposed work contemplates excavating two to four hard rock ledges, * * *.
In constructing the experimental levee referred to in finding 7, the Government discovered that proper material could not be obtained by the dredge Welatha without first blasting the rock. As a result three different drill boats were used at various times for drilling and blasting ahead of the dredge. Careful records in connection with the work of the Welatha and the drill boats were kept and made available to plaintiff.
The surface elevation of the lake varied but the average was plus 16, the bottom of the lake was plus 4.2, and the average depth of the water was about 12 feet. The material at the top of the bed of the lake was called “overburden” consisting in part of materials called “muck” and in part of “sand, shell and marl.” The depth of the overburden varied between plus 8 and minus 5 feet. Below the overburden, the contract drawings showed 8 strata of rock called “soft,” “medium” and “hard.” The elevation of the rock varied from plus 7 to minus 20 feet, with an average elevation at the bottom of minus 15 or 82 feet below the surface of the water.
The records kept in connection with the work of the Weltaha showed that the drill boats used by defendant had drilled and blasted to an average depth of minus 7.07 (approximately 20 feet below surface of the lake), and a bank of material had been dredged 13.8 feet thick or to an average depth of minus 8.2 (approximately 21% feet below surf ace of the lake). However, the records also showed that the average thickness of rock in the area from which the material for the experimental levee was obtained was only about one-half of that in the area where the work under the contract was to be performed.
The specifications further set out that the Welatha had dredged in borrow pits which varied from 160 feet to 290 feet in width.
Waldeck, plaintiff’s superintendent, was an experienced hand in dredging work, including the use of drilling and *145 blasting equipment. He had supervised work performed by plaintiff in constructing levees for defendant on Lake Okeechobee between 1933 and 1936. While he was assisted by others, he took a most active part in investigating the site of the work, preparation of the estimate, planning methods by which the contract was to be performed, and procuring and equipping the machinery needed.
As soon as the contract drawings and specifications had been received from defendant, Waldeck set about checking their accuracy and investigating the site in a careful manner. For almost two weeks, soundings and probings were made and a drill rig was used to explore the material to be encountered. Borings made in the borrow pits dredged by the 'Welatka disclosed that these pits had since filled up considerably and some boulders were found in the bottoms.
Waldeck was satisfied that the data on the contract drawings were correct and after the investigation above mentioned concluded that the work under plaintiff’s contract would be more difficult than that done by the Welatka because the rock to be dredged in the contract area was harder than that encountered by the Welatka.
Taking these things into consideration, Waldeck concluded that since the Welatka had dredged a bank of material having an average thickness of 13 feet and to a depth of minus 9 or 10 feet, including 4 or 5 feet of rock, plaintiff could procure the material needed for the levee from a borrow pit averaging 300 feet in width and having an average depth extending down through a 13-foot bank of material, including 4 or 5 feet of rock. He planned to dredge to a minimum depth of about minus 7 feet and to a maximum depth of approximately minus 9 or 10 feet (21 or 22 feet below surface of the lake).
In its estimate of the quantity of material required to be pumped under the contract (paragraph 1-04 specifications), plaintiff was reassured after the contract had been awarded to it, by an estimate made available by the defendant for the rental of a dredge under the proposed contract. This estimate, based upon the operation of the Welatka from October 11,1938, to March 25, 1939, showed that an average of 580 cubic yards of material per hour had been pumped. *146 Upon the assumption that the dredge would operate 500 rental hours per month, defendant’s engineers estimated that the dredge under plaintiff’s contract would pump 260,000 cubic yards of material per month from the borrow pits or a total of 2,600,000 cubic yards in a period of ten months. Plaintiff had estimated that, taking into consideration the quantity of waste material in the borrow pit area shown on the contract drawings and the gradation requirements, it would be required to pump 2,700,000 cubic yards of material.
Plaintiff owned the dredge General, a sister ship of the Welatha, but a better and more powerful dredge. However, at the time its bid was prepared it did not own a suitable drill boat. After examining the records of the drill boats used in connection with the experimental work of the We-latha, plaintiff concluded that neither of them could drill and blast an average of 450 holes per working day in the contract area (paragraph 1-14 specifications); that it would need a more efficient boat, and therefore decided to procure and equip a boat which would drill over 400 holes a day.
Plaintiff, in compliance with the requirement contained in the invitation for bids that the bidder describe the character and amount of plant proposed to be employed, described a “Drill Boat No. 3” along with the dredge General and other equipment capable of producing 250,000 cubic yards of material per month. The bid further stated that the maximum drilling depth of the boat was 40 feet and that it was located in Miami, Florida. The bid also stated that plaintiff’s plant would place 500 cubic yards of the specified material (paragraph 4-08 specifications) in the levee per rental hour.
Here it must be noticed that at the time the bid was submitted, plaintiff did not own a drill boat as described and, in fact, no such boat was in existence. Furthermore, after this drill boat, hereafter referred to as Drill Boat No. 3, had been constructed from a steel barge later acquired by plaintiff, it did generally conform to the description in the bid except that it was not equipped to drill to a maximum depth of 40 feet. In view of the dimensions of its proposed borrow pit, plaintiff had not intended when it submitted its bid to drill to a depth of 40 feet. The contracting officer was given *147 no notice of this intention and considered that the statement in the bid indicated that the contractor meant to drill to a depth satisfactory to defendant.
Under the provisions of the contract, plaintiff was required to have its plant on the site ready to begin operations by November 6, 1939. The dredge General, Drill Boat No. 3, and the other equipment arrived simultaneously on November 4, 1949. The drill boat began drilling and blasting on November 7, 1939, and the dredge began pumping on November 9, 1939. In other words, the dredge was required to wait two days for the drill boat to get ahead of it before material was available for it to dredge. Paragraph 1-05 of the specifications called for the assessment of liquidated damages at the rate of $100 per day for delay in starting work and one day’s assessment was levied against plaintiff.
Drill Boat No. 3, when it began operations, had a great deal of new equipment and machinery that had been recently installed. Furthermore, it was manned by a “green” crew except for the captain and superintendent. Plaintiff knew from previous experience that it required almost a month to break in new equipment and train a new crew so that they could work effectively and efficiently. Plaintiff later explained that it expected to fall below the daily production average at the outset because of the new boat and green crew, but anticipated making up such deficiencies by exceeding the average figures as the work progressed.
When the work began, defendant’s agents merely staked out ranges as a guide for plaintiff’s operations and at no time made any effort to designate borrow pit limits. From November 7 to December 4, 1939, Drill Boat No. 3 drilled and blasted to an average depth of 15 feet below ground surface and to an average depth of about 10 feet in the rock material below the overburden. In order to drill and blast to that depth, it was necessary to redrill and reblast a portion of the area, which meant drilling, blasting and dredging one layer of material, then moving the dredge back to permit the drill boat to redrill and reblast in the same area.
On November 10,1939, dredging in the contract area began (dredging began on Nov. 7 100 feet outside the contract area to enable the dredge to cut down into contract area). Be *148 tween this date and December 4, 1939, the average dredging rate was 362 cubic yards of material per hour in a borrow pit 200 feet wide then being used by plaintiff.
On December 4, plaintiff began to widen its borrow pit to a width of 250 feet, and then the controversy which brought about this law suit began. Defendant’s inspector protested on the ground that suitable levee material remained in the 200-foot borrow pit, but plaintiff continued to operate in the wider pit until on December 7, the inspector directed plaintiff not to drill or dredge in a borrow pit exceeding 200 feet in width without obtaining the contracting officer’s consent.
Plaintiff on that date wrote defendant’s resident engineer requesting him to obtain a decision from the contracting officer on the question. Among other things contained in the letter, plaintiff, after insisting that nothing in the specifications or plans required the dredge to excavate to any specific depth or width, disclosed to defendant for the first time its proposed borrow pit. A map had been on file in plaintiff’s field office but a copy of it was not furnished to the Government nor had the dimensions of the proposed pit ever been called to defendant’s attention. If at the time the bids were received defendant’s contracting officer had known that plaintiff planned to excavate its borrow pit to an average depth of only 13 feet below ground surface, the bid would not have been accepted.
According to plaintiff’s letter, it proposed to use a borrow pit having an average width of 300 feet and an average depth of minus 11 feet (minimum 7 to maximum minus 15). It will be recalled that the rock formation lay between plus 7 and minus 20 feet, so that by drilling and blasting to an average depth of minus 11 feet a great deal of rock material would be left in the bottom of plaintiff’s borrow pit. During December 1939, defendant’s engineers prepared a diagram which showed the width and depth of the borrow pits required for the contract work as varying from 175 to 245 feet and from minus 13.5 to minus 17. However, this information was not given to plaintiff until January 2, 1940.
Plaintiff correctly contends that the contract did not specify the width or depth of the borrow pits to be excavated. *149 There was evidence that defendant’s resident engineer wanted to incorporate such a requirement in the specifications because he was convinced that the best material for the construction of the levee would be obtained from a 200-foot-wide borrow pit, except in areas where a wider pit was needed to obtain suitable material. In other words, the exact linear measurement of the borrow pit was not the controlling consideration. On the contrary, it was the suitability of material which defendant’s agents emphasized. The District Engineer, the Division Engineer, and the Chief of Engineers all decided that it would be impracticable to limit the width of the borrow pit in the specifications for the reason that, due to conditions unforseen by defendant’s engineers, suitable materials might not be found within such limits.
Defendant’s resident engineer forwarded plaintiff’s letter to the contracting officer with a memorandum in which he called attention to the discretion lodged in the contractor by paragraph 1-14 of the specifications, supra, but emphasized paragraph 1-12 with reference to obtaining “harder and more desirable levee materials.” His conclusion was that plaintiff should be directed to remove all rock and other suitable material from the 200-foot borrow pit before widening out and in the event sufficient suitable materials could not be found in the 200-foot pit, the contractor should then be permitted to widen the pits enough to provide the required amount of levee materials.
We believe this recommendation was quite reasonable and fair under the contract, specifications, plaintiff’s bid and the circumstances.
In the absence of the contracting officer, the District Engineer’s office incorporated these recommendations in a telegram to plaintiff on December 11, 1939. Plaintiff replied by wire stating that it had widened the borrow pit in order to obtain suitable material — not because of ineffective blasting — and requested permission to dredge in the area of the wider pit which had been drilled and blasted.
The District Engineer’s office authorized plaintiff on December 13,1939, to take out the rock which had been blasted from the wider pit and advised that as soon as practicable *150 defendant would stake out definite ranges for borrow-pit areas wlierein future drilling and blasting should be confined.
Until December 4, when plaintiff widened its borrow pit, Drill Boat No. 3 had averaged drilling and blasting 250 holes per day to an average depth of 15 feet below the ground surface, but from December 4 through December 13, Drill Boat No. 3 had averaged 560 holes per day to an average depth of only 8 feet below ground surface or about 5 feet less than the average depth of the borrow pit which plaintiff itself had proposed to use. It was not necessary for plaintiff to widen the borrow pit to obtain the quantity of suitable material needed for the levee, since the evidence clearly showed that the amount of material needed for levee construction was greater between the stations where the 200-foot borrow pit was used than between the stations where plaintiff dredged from a wider pit.
At this point we must consider just what caused plaintiff to abandon its own proposed plan to drill in a narrower pit to a reasonable depth and to spread out into a wider pit where shallower drilling was done. Of course, we can only speculate regarding the reason for this action, but it appears to us that it can be accounted for by the fact that plaintiff discovered that its drill boat could not drill fast enough and deeply enough to provide the amount of hourly production required under the contract. As we have previously pointed out, the plaintiff’s dredge General was a big, powerful boat, fully capable of dredging the type and amount of levee materials to meet the production requirements. We must conclude that plaintiff’s Drill Boat No. 3 was unable to drill deeply enough and fast enough to stay ahead of the General. As a matter of fact, during the redrilling and reblast-ing activities of the plaintiff, the captain of the dredge complained that his boat was delayed and its progress reduced by the ineffective blasting of the drill boat.
Instead of recognizing its real problem and attempting in some way to overcome it, plaintiff began a series of protestations which in effect involved the issue previously raised. By telegram and letter of December 18, 1939, plaintiff protested the District Engineer’s order of December 13, restrict *151 ing plaintiff to a 200-foot borrow pit, and argued that the result of the order was to require plaintiff to produce a larger percentage of hard rock in the levee than had been dredged by the Welatka.
On December 22, plaintiff wired the contracting officer that compliance with the order was causing delay and expense and again asked permission to widen its borrow pit.
Defendant’s contracting officer on that day, wrote plaintiff a lengthy letter setting out the Government’s position (See finding 25) which under all the circumstances impresses us as fair and reasonable from the standpoint of both parties concerned.
In reply, plaintiff on December 26, 1939, wrote the contracting officer that plaintiff had changed its method of drilling and blasting the various stratas in separate layers and was drilling and blasting to the full depth (finding 26). From November 7 to December 26, 1939, plaintiff had been redrilling, reblasting, and redredging portions of the borrow pit. This resulted in the excavation of materials in layers. It is to be noticed that while the practice did not prevent plaintiff from complying with the gradation requirements of the contract, it did not provide a uniform distribution of the material in the levee section. When blasted to full depth and dredged in one operation, material dredged and pumped consisted of a well-mixed combination of rock, marl, sand, and shell. Plaintiff’s redrilling operations were performed in the rock formation after the softer materials above had been pumped out by the dredge and redredging in this material resulted in the deposit of pockets or laminations of rock in the levee.
On December 27, 1939, defendant’s agents visited the site, and delivered to plaintiff’s representatives a letter stating that since the contractor was not complying with the instructions given by the contracting officer in his letter of December 22, plaintiff should cease dredging operations immediately and drill and blast the borrow pit to a depth sufficient to enable the dredge to excavate the full depth in one operation. The letter further stated that dredging should not be resumed until the work was conducted in compliance with the contracting officer’s instructions.
*152 Plaintiff’s superintendent Waldeck, when informed of the shut-down order, instructed his employees to disregard it and to continue dredging operations. On December 28,1939, he advised the contracting officer by wire that he considered the order unreasonable and was continuing to operate the dredge. He asked for a conference to discuss the question. On December 29, 1939, the contracting officer wired Waldeck that no payment would be made for material dredged after 3: 35 P. M. on December 27 until dredging was performed in accordance with the specifications and contract.
Plaintiff’s dredge was then shut down and did not resume operations imtil February 12, 1940.
At a conference in Miami on December 30, 1939, the contracting officer and Waldeck discussed the disputed matters, but permission to widen the borrow pit was refused. The verbal instructions which the contracting officer issued at the conference were confirmed by his letter of January 5, 1940 (finding 28), which in substance stated that plaintiff should suspend dredging until its drill boat was altered to enable it to drill and blast to the required depth in one operation, since dredging and depositing the material in layers was contrary to the specifications and would probably result in weak spots in the levee and a break therein during a hurricane. At the conference, plaintiff had requested permission to dredge to a depth of only minus 10 feet pending alteration of its drilling equipment, but the letter denied this request on the ground that such a practice would be contrary to paragraph 1-12 of the specifications.
By letter of January 6, Waldeck again contended that the specifications did not authorize the contracting officer to limit the width of the borrow pit and that plaintiff’s drilling equipment met the specification requirements.
On January 3, plaintiff had asked permission to waste the unsuitable material in the borrow pit as a separate operation, but the contracting officer refused on the ground that wasting it by that method would not only increase the cost to the Government but would result in additional delay in completing the project before the hurricane season.
Since the adequacy of plaintiff’s drill boat had been brought into question by defendant’s agents, who frequently *153 referred to the work of the Atlas during its operations with the Welatka, plaintiff asked to lease the Atlas. On January 5, 1940, the contracting officer agreed to lease the Atlas to plaintiff a short time to determine the suitability of this type of drill boat for drilling and blasting material for excavation by the dredge General.
Commencing January 6, 1940, the Atlas and Drill Boat No. 3 operated together in a part of the contract. The Atlas drilled and blasted between stations 373 and 375, an area not previously drilled and blasted, while Drill Boat No. 3 drilled and blasted between stations 375 and 378, a portion of which area had been partially drilled and blasted but not dredged. It is conceded that drilling and blasting in an area of undisturbed ground is easier than in an area partially drilled and blasted.
The boats were equipped differently in that the Atlas had only one drill, using a bit 5 or 6 inches in diameter, while Drill Boat No. 3 had four drills and used bits 2% inches in diameter. The former drilled to a depth of 32 feet below the surface of the water (approximately minus 20) and the latter to a depth of 30 feet (approximately minus 18). Both boats drilled and blasted to these depths in one operation well ahead of any dredging.
A comparison of the results of these operations is interesting. It was found that Drill Boat No. 3 drilled and blasted an average of 146 holes per day, whereas the Atlas drilled an average of only 89. Boulders which could not be dredged were found in the borrow pits covered by the Atlas, but there were none in the pits of Drill Boat No. 3. Defendant’s clam-shell could dig down more quickly in Drill Boat No. 3 territory than in that of the Atlas.
The work of the dredge General is also quite interesting. The boat dredged in the area from February 13 to February 24,1940, and pumped an average of 554 cubic yards per hour of material blasted by Drill Boat No. 3 and an average of 530 cubic yards per hour of material blasted by the Atlas.
In this test area, the progress of the dredge was much greater than in areas where there had been redrilling, re-blasting, and redredging.
Thus, it was clearly established that the plaintiff’s dredge *154 General was capable of pumping' more than 500 cubic yards of material per hour but that, in order to enable the dredge to equal or exceed the rate of production required by the contract, it was necessary for plaintiff to have a drill boat or boats which could drill and blast the material to the necessary depth in one operation and well in advance of the dredging.
Obviously, plaintiff’s equipment failed to accommodate the General to the extent required for several reasons which have already appeared in our discussion of the facts. First, Drill Boat No. 3 and the General arrived on the job at the same time and the drill boat was given only two days to work ahead of the dredge. Second, Drill Boat No. 3 was a new boat manned by a green crew. Third, Drill Boat No. 3, although equipped to work faster than the Atlas, was not able to do the work involved in the contract at the rate plaintiff said it could when its bid was submitted (findings 13 and 14).
Since all of these things were known to plaintiff and its agents, it appears to us that they deliberately resorted to shallow drilling and blasting in order to enable the dredge to pump yardage at the rate required by the contract. The obligations assumed by plaintiff under the contract were its responsibilities. No excuse for its failure to meet them can be attributed to defendant or its agents who, in our opinion, were fair and reasonable in their demands upon plaintiff.
On January 12, 1940, an explosion in the water occurred near Drill Boat No. 3. One man was killed, several others were injured, and the boat was badly damaged. At the inquest, the coroner found that the cause of the explosion was unknown. As will appear later, the contracting officer concluded that the explosion was caused by jamming dynamite into a crooked drill hole (finding 34), but the evidence does not support his conclusion.
The drill boat had to be removed from the job and taken to the shipyard for repairs which, according to plaintiff’s estimate, would require six weeks.
On January 18,1940, the contracting officer advised plaintiff by telegram that the progress of the work was far behind schedule and that, in his opinion, this was due to the type of drilling equipment used by plaintiff. He requested infor *155 mation regarding plaintiff’s plans for meeting the construction schedule.
Plaintiff replied that defendant’s restrictions on the width of plaintiff’s borrow pit not only caused the lack of progress but had increased plaintiff’s costs. The telegram also advised defendant of plaintiff’s plan to use a 4-stand well drill barge to finish drilling and blasting between stations 378 and 376 and to thereafter close down the job.
After receipt of this telegram, the contracting officer wired plaintiff on January 22, 1940, that the drilling equipment being used on this contract (W-436-eng-6846) and another contract on which plaintiff was working nearby (W-436eng-6935) was unsatisfactory as to type, capacity and safety, and that all drilling operations on both contracts should cease until satisfactory drilling equipment was placed on the jobs.
Plaintiff’s Drill Boat No. 4, which was being used on contract No. 6935, was identical in all respects with Drill Boat No. 3 except it was equipped with three drills instead of four.
On January 23, 1940, plaintiff asked permission to continue the use of Drill Boat No. 4 on contract No. 6935 with certain supplementary equipment.
On January 24, the contracting officer authorized plaintiff to use the well drill barge for completing work under the instant contract in areas partially blasted but demanded removal at once of Drill Boat No. 4 from the site of contract No. 6935 as it was unsatisfactory as to type, capacity, and safety.
The well drill barge went on the job immediately after the authorization but sank the next day in a gale. It was not designed for the type of work required under this contract.
At this point, we find plaintiff’s job entirely shut down because of the incidents detailed above. It was to be expected that plaintiff would do everything possible to get the work going again and in a telegram of January 25, 1940, from its Baltimore office plaintiff stated it could not understand the contracting officer’s objection to the use of *156 Drill Boat No. 4 on contract No. 6935 as the explosion which damaged Drill Boat No. 3 was not due to the type of boat used.
On the same day, the contracting officer replied that his investigation showed the size of drills being used on Drill Boat No. 3 were responsible for the explosion and that since Drill Boats No. 3 and No. were almost identical, neither could be used by plaintiff thereafter on Government contracts.
Defendant’s resident engineer, on January 25, 1940, wrote plaintiff’s supei’intendent Waldeck a letter incorporating the contracting officer’s telegram of January 24, 1940, and demanded the immediate removal of Drill Boat No. J from contract No. 6935.
The next day Waldeck replied that the use of the drill boat was necessary for the performance of the contract and unless he was otherwise instructed by his superiors at plaintiff’s main office, he had no intention of removing the drill boat from the job. Waldeck also wrote defendant’s resident engineer a letter in denial of the contracting officer’s statements that plaintiff’s drill boats were unsatisfactory as to type, capacity and safety.
A few days later, on January 31, 1940, the contracting officer invoked the provisions of Article 12 of the contract and requested plaintiff to remove Waldeck on the ground that he was objectionable and incompetent. His action was based upon his determination that the ineffective work of plaintiff’s drill boat was responsible for the fact that less than one-half of the guaranteed output had been dredged, that Waldeck had been frequently asked to secure better drilling equipment, but that instead of complying with such requests, he had argued about the meaning of the specifications. The contracting officer also felt that Waldeck was objectionable because of his refusal to cooperate in carrying out suggestions made by the Government from time to time for increasing the progress of the work.
Plaintiff removed Waldeck and replaced him with a Mr. Beuttenmiller, who had been in charge of the dredge. During the short time thereafter that plaintiff performed work on the contract no dispute arose between him and the contracting officer.
Pursuant to paragraph 1-07 of the specifications plaintiff *157 on February 2, 1940, notified defendant of its intention to terminate the contract after completing four months of operation, on March 7, 1940. At the time this notice was given, plaintiff had no drill boats in operation. Drill Boat No. 3 was undergoing repairs and Drill Boat No. 4 had been shut down as a result of the contracting officer’s objections. This lack of equipment, together with defendant’s borrow pit restrictions induced plaintiff to elect to terminate the contract.
The dredge General was permitted by the contracting officer to resume work on February 12,1940, in order to dredge the material previously blasted by the Atlas and Drill Boat No. 3 between stations 373 and 378. On February 24, 1940, this work was completed and no other work was performed on this contract after that date.
However, it is well to notice what happened after Drill Boats No. 3 and 4 had been altered and improved and were later used on contract No. 6935. On February 10,1940, after a conference between the parties, the contracting officer authorized the use of these boats for completing the contract subject to certain alterations (findings 39 and 40). In compliance with the contracting officer’s requirements these boats drilled and blasted the material in one operation to required depths as great as from 35 to 40 feet below the surface of the water (minus 25 to minus 30). Both boats performed in a manner satisfactory to the contracting officer and on April 19, 1940, he wrote plaintiff that the restrictions imposed by him on February 10, 1940, were removed.
Later, on May 26, 1940, by supplemental agreement to contract No. 6935, the dredge General was leased to defendant to perform levee work between stations 229 and 275 — part of the area covered by the contract in suit.
Drilling and blasting between these stations was performed by Drill Boats No. 3 and 4, during June and July and completed on July 19, 1940. The holes were drilled in one operation to depths varying from 15% to 24 feet below the ground surface (minus 11% to minus 21). The General dredged this area between July 22 and September 10, 1940, and its production varied between 228 and 806 cubic yards per hour with an average of over 467 cubic yards per hour.
*158 These facts indicate to us that plaintiff could have met the production requirements under the contract had it placed adequate and suitable drilling equipment on the job. If, after the first few days of drilling when it was learned that Drill Boat No. § could not drill deep enough and fast enough in one operation to furnish suitable material for the levee and stay ahead of the dredge General, plaintiff had admitted this inadequacy and set about in a conscientious manner to remedy it, we have no doubt that this controversy would have been avoided. Whatever equities existed at that time in plaintiff’s favor, and there were some, were dissolved by plaintiff’s persistent refusal to recognize its own difficulty. The contracting officer’s “interference” was prompted, in our opinion, by his desire to see proper materials placed in the levee. Breaks had occurred in the very levee sought to be improved under this contract because it had been made of softer materials, and the whole intent and purpose of this project as expressed in the invitation for bids, the specifications and the provisions of the contract was to get a levee of conglomerate materials, including among other ingredients a large percentage of rock.
It is clear that certain quantities of material could be obtained by shallow drilling and dredging or by redrilling and redredging, but we are convinced that these operations would not provide the type of levee construction which the contract contemplated. Plaintiff’s insistence that it be permitted to widen its borrow pits was prompted by its overwhelming desire to pump material from such pits as rapidly as possible. On the other hand, defendant’s agents were equally insistent that the levee be constructed with the materials and in the manner as, in their judgment, were required by the contract and specifications.
We do not believe that the evidence before us justifies the conclusion that defendant’s agents “interfered” with the plaintiff’s operations arbitrarily or unreasonably. Consequently, plaintiff’s contention that the actions of defendant’s representatives prevented performance by plaintiff of its part .of the contract, thereby constituting a breach of the agreement, cannot be sustained.
Under the contract, three estimates were prepared by defendant for determining plaintiff’s compensation (see find *159 ing 42). The contracting officer adopted the one which yielded the lowest amount and sent plaintiff a voucher in the sum of $3,106.82 to cover the first and final payment to plaintiff. On July 24,1940, plaintiff refused to accept the voucher, and after several conferences finally presented a claim on June 10, 1942, to the contracting officer in the amount of $278,520.41. With this claim, plaintiff made the contentions upon which this action is based and asserted that since defendant had breached the contract, plaintiff was entitled to the costs incurred in performance of the contract.
This letter was treated as an appeal from the contracting officer’s ruling and on December 9, 1942, he made findings of fact and furnished plaintiff with a copy thereof. The findings are set out in our finding 44.
After a conference with the representative of the Chief of Engineers, plaintiff in a letter of March 9,1943, to the Chief of Engineers reiterated the contentions made in its letter of June 10, 1942. In addition, plaintiff, for the last time, attempted to excuse its lack of performance on the basis of a comparison between the percentage of rock which, it argued, would have been placed in the levee from plaintiff’s proposed borrow pit and the percentage of rock that was deposited in the experimental levee by the Government dredge Welatha.
With respect to this argument and the other contentions made by plaintiff to the effect that the operations of the Welatha supplied a pattern or standard for performance of the contract, we are of the opinion that the data contained in the specifications regarding the experimental dredging by the 'Welatha were for informative purposes only and did not constitute representations, either that a performance similar to that of the 'Welatha would be accepted as compliance with the contract, or that plaintiff would encounter the same conditions as were found in the experimental levee construction. As a matter of fact, plaintiff concluded before its bid was submitted that the contract work would be more difficult, that it would be required to drill and blast through from two to four hard rock ledges, and that the rock in the contract area was much harder than that found during the operations of the TVelatha.
On March 16, 1943, the Chief of Engineers rendered his *160 decision and affirmed that of the contracting officer in all respects except that plaintiff was allowed $42,172.36 instead of the $3,106.82, which the contracting officer found to be due (see finding 46). .
The plaintiff informed the Chief of Engineers on April 13, 1943, that the decision was unsatisfactory and requested a reconsideration. This request was granted and on May 11, 1943, plaintiff was advised that no change in the decision would be made. On July 28, 1943, a voucher in the amount of $42,172.36 was mailed to plaintiff which it accepted under protest.
Since there is no dispute as to the actual yardage of materials dredged by plaintiff (finding 48), and since we have concluded that there was no breach of contract, plaintiff is not entitled to recover in this action unless its final contention prevails.
Plaintiff says the following provisions' of paragraph 1-08 of the specifications constitute a penalty which should not be enforced:
If the quantity of material excavated by the dredge (as determined by borrow pit measurement) exceeds the guaranteed output for the period (as computed above), the excess yardage will be paid for at 100 percent of the unit price (obtained by dividing the hourly rental rate by the guaranteed hourly output) and added to the sum earned by the lessor at the rental rate for the period.
If the quantity of material excavated is less than the guaranteed output for the period (as computed above) the deficiency yardage, multiplied by 126 percent of the unit price (obtained by dividing hourly rental rate by guaranteed hourly output) will be deducted from the sum earned by the contractor at the rental rate for the period.
By these terms, plaintiff was to be paid a rental rate of $135 per hour for a guaranteed hourly output of 500 cubic yards, or 27 cents a yard. If, for example, it produced 600 cubic yards it was to be paid 500 x $0.27 plus 100 x 100% of $0.27. If, on the other hand, it produced only 400 cubic yards, it was to be paid 400 x $0.27 minus 100 x 125% of $0.27.
As we have previously pointed out, both the contracting officer and the Chief of Engineers stated that the contract *161 was in fact one for a unit price of 27 cents per cubic yard with a penalty attached for failure to meet the contract requirements and plaintiff understood that the contract called for a penalty in the event of its failure to dredge the guaranteed amount of material.
Whether we say the contract called for a “penalty” or “liquidated damages” must be determined by an examination of the language used in the light of the subject matter of the contract and the intention of the parties.
Here the Government wanted a levee of fairly hard materials erected before the coming of the next hurricane season. Both plaintiff and defendant knew that a levee built of softer materials contained weak spots which would not withstand a hurricane. Both parties knew and the court will take judicial notice of the fact, that the hurricane season on the east coast of Florida comes in the months of August and September each year. Thus there was a deadline for the completion of the contract which was recognized and fixed in the terms of the contract itself by the dates for starting and completing the work to be done.
Defendant desired that the work be done well, in accordance with the specifications and within the time specified, but it provided an incentive for earlier completion of the contract by offering the contractor a “bonus” for excavating materials for the levee at a greater rate than the minimum output required by the contract. Plaintiff thought it could profit by such a proposition for it freely entered into the contract, realizing at the same time that if required production was not maintained it would be “docked” or “fined” for any deficiency.
The language used plainly expressed such an agreement and we cannot say that the parties intended anything else. Sun Printing and Publishing Association v. Moore, 183 U. S. 642, 661.
“When that intention is clearly ascertainable from the writing, effect will be given to the provision as freely as to any other * * *. There is no sound reason why persons competent and free to contract may not agree upon this subject as fully as upon any other, or why their agreement, *162 when fairly and understandingly entered into * * * should not be enforced.” Wise v. United States, 249 U. S. 361, 365.
The provisions of paragraph 1-08 are clearly drawn and the intention of both parties is readily ascertainable. Plaintiff had engaged in other contracts with the Government of an almost identical nature, was generally familiar with contracts involving this sort of work, and clearly understood the effect of these provisions in the contract. Therefore, we cannot say that plaintiff was not competent to execute this contract nor can we say that it did not freely enter into it.
Under these circumstances, we conclude that these provisions are valid and enforceable. Since the Chief of Engineers based his final calculations upon them in determining the final amount due plaintiff, plaintiff is entitled to no further recovery.
The petition therefore will be dismissed. It is so ordered.
Madden, Judge; Whitaker, Judge; Littleton, Judge; and Jones, OMef Judge, concur.